**EXHIBIT A**

PUBLIC MATTER

**FILED**

OCT 2 1 2004

STATE BAR COURT CLERK'S OFFICE
SAN FRANCISCO

**STATE BAR COURT**

**HEARING DEPARTMENT – SAN FRANCISCO**

| | |
|---|---|
| In the Matter of | Case No. 02-O-11383-PEM |
| **PADAM KUMAR KHANNA,** | **DECISION AND ORDER OF INVOLUNTARY INACTIVE ENROLLMENT** |
| **Member No. 85229,** | |
| A Member of the State Bar. | |

## I. <u>INTRODUCTION</u>

This disciplinary case involves a seasoned attorney who had created a web of deceptions to seduce his unsophisticated clients to invest $31,000 in a sham corporation and who insists on these same fraudulent and contrived misrepresentations before this Court. His acts of moral turpitude and dishonesty shock the conscience of the legal profession, pose a danger to the public, and degrade the highest possible professional standards for attorneys.

Respondent **PADAM KUMAR KHANNA** is charged with multiple acts of misconduct in one client matter. The charged misconduct includes (1) failing to comply with certain prophylactic requirements regarding an adverse interest; (2) misappropriating client's investment funds; (3) failing to return client files; (4) failing to render an accounting; (5) misrepresenting to the State Bar regarding the disposition of client funds; (6) misrepresenting to the State Bar about the client files; and (7) failing to cooperate in the State Bar investigation.

This Court finds, by clear and convincing evidence, that Respondent is culpable of all but one of the charged acts of misconduct. Based upon the egregious nature and extent of culpability, as well as the applicable aggravating circumstances, the Court recommends that Respondent be disbarred from the practice of law in California.

## II. PERTINENT PROCEDURAL HISTORY

The Office of the Chief Trial Counsel of the State Bar of California (State Bar) initiated this proceeding by filing a seven-count Notice of Disciplinary Charges (NDC) on June 25, 2003. On August 4, 2003, Respondent filed a response to the NDC.

At the August 2, 2004 pretrial conference, the parties stipulated to some of the facts underlying the State Bar's charges. These agreed-upon facts were memorialized in a Stipulation As to Facts on August 17, 2004.

A three-day trial was held August 17-19, 2004. The State Bar was represented in this proceeding by Deputy Trial Counsel Tammy Albertsen-Murray. Respondent represented himself.

At the close of the hearing, the parties agreed to submit closing trial briefs on September 1, 2004. The Court took this proceeding under submission on September 7, 2004, after the parties had filed closing trial briefs.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.    Jurisdiction**

Respondent was admitted to the practice of law in California on May 15, 1979, and has been a member of the State Bar of California at all times since that date.

**B.    Findings of Fact**

The following findings of fact are based on the parties' partial stipulation of facts and the evidence and testimony introduced at this proceeding. Other than Respondent, the witnesses who testified at trial were Jagjit Sing Randhawa, Baljit Randhawa, attorney Bryant H. Byrnes, and State Bar investigator Alice Verstegen. The Court finds Respondent's testimony to be self-serving and not credible. However, the Court finds the other witnesses to be credible.

### 1.    Representation of Baljit Randhawa

Jagjit Sing Randhawa and Baljit Randhawa are Indian immigrants who speak very limited English. Jagjit has been a gas station attendant in Oakland since 1989 and had a second job at a car rental company in Berkeley until 2000. His wife, Baljit, has worked at a fast food restaurant for the past six years.

While working at the car rental company, Jagjit met Respondent, who was a frequent

1  customer there and speaks Jagjit's native language, Punjabi. Jagjit considered Respondent to be a

2  friend because of their common culture and language.

3          Between 1996 and 1999, the Randhawas hired Respondent to represent them in several legal

4  matters.

5          In 1996, Respondent provided legal services on behalf of and advice to Baljit in three

6  matters: (1) Vehicle Code violations; (2) Temporary Restraining Order (TRO); and (3) shoplifting.

7  There was no fee agreement.

8          The Randhawas testified that they paid Respondent the fees he had charged. Jagjit paid

9  Respondent $1,000 for the Vehicle Code violations case and $500 for the shoplifting matter. He did

10  not ask for a receipt. Respondent discussed the TRO matter with Baljit but did not charge any legal

11  fees.

12          Therefore, the Randhawas did not owe Respondent any legal fees in those three matters.

13              a.      Respondent's Contentions

14          Respondent denies that he had ever received any compensation for his services in the

15  Vehicle Code violations case or the TRO matter. Respondent testified that although he did not

16  represent Baljit on the TRO matter, he did discuss the matter with her and had expected to be paid.

17  But Respondent did not have a written  fee agreement with the Randhawas and never asked for any

18  fees.

19          Respondent further claims in a July 13, 2001, letter to the Randhawas' subsequent

20  counsel, attorney Bryant H. Byrnes,[1] that the Randhawas owed him an additional $4,500 for his

21  representation in the shoplifting matter. But Baljit did not plead guilty to shoplifting and was let off

22  on a fine of $100. Moreover, Respondent testified he did not have a copy of any written fee

23  agreement and that he does not remember whether he charged a flat fee.

24          Thus, Respondent's contention that the Randhawas still owe him legal fees in Baljit's

25  three matters is without merit.

26  //

27  ───────────────

28      [1]State Bar exhibit 9, p. 9.

2. ***Representation of Jagjit Randhawa***

Respondent represented Jagjit in two legal matters.

In or about 1996, Respondent represented Jagjit in one DUI case. Respondent charged him $2,500 which Jagjit paid. Again, there was no written fee agreement.

In 1997, Jagjit hired Respondent to retrieve some of his personal property from a friend's house. Jagjit paid Respondent $700 to handle the case, as charged by Respondent. The Randhawas paid Respondent in full.

a.    <u>Respondent's Contentions</u>

Respondent claims that he charged Jagjit $3,000 for the DUI matter and that he received only $500. As a result, Respondent argues that Jagjit still owes him the balance of $2,500.

Respondent also contends that he charged the Randhawas $3,500 for the personal property case but received only $500. Respondent admits that while he thinks he gave Baljita a fee agreement in this matter, he does not have a copy even though it is his policy to keep a copy of his fee agreements.

Respondent's contention that the Randhawas still owe him legal fees in Jagjit's two matters is rejected.

3. ***The Randhawas' Investment in Amerindia Foods Limited***

Amerindia Foods Limited (AFL) is a food company incorporated in 1992 that is supposedly located in India. AFL's primary business purpose was to manufacture mango juice and manage a large tomato farm in India. According to Respondent, he was one of AFL's principal founders. Other founders included his family and relatives. Respondent was AFL's President of the North American branch and legal counsel in the United States. Respondent's brother, Chiter S. Khanna, was AFL's chairman. In 1996, when his brother had a heart attack, Respondent was sometimes referred to as the chairman of AFL. Respondent testified that between 1995 and 2003, the company tried to acquire machinery but was unsuccessful.

In June 1995, Respondent opened a checking account at Bank of America in the name of Khanna Foods, USA, account number 05559-07175 (Khanna Foods account). According to Respondent, Khanna Foods, USA was not a company – it was his own business name. Respondent

1    admitted that he was the sole proprietor of Khanna Foods, USA. He set up the account to receive

2    royalty payments from AFL for technology that he and his mother had developed with respect to

3    hybrid tomato seeds and to pay any incidental expenses that Respondent as legal counsel for AFL

4    incurred in the United States.

5        In 1996, while representing the Randhawas, Respondent frequently discussed with Jagjit

6    about AFL, its lucrative potentials, and the window period that the Randhawas could also partake

7    in this business venture. Respondent enticed the Randhawas to invest in AFL. After viewing the

8    company brochure and placing their trust on Respondent as a friend and attorney, the Randhawas

9    became convinced of AFL's profitability and hurriedly gave Respondent $25,000 for investment in

10   AFL within the deadline before Respondent left for India in November 1996. In return, the

11   Randhawas were to receive certain shares of stock in AFL.

12       Respondent provided the Randhawas with deposit slips to his personal bank account and

13   Khanna Foods account. Respondent instructed them that each deposit should be less than $10,000

14   to avoid the scrutiny of tax officials. The deposit made in Respondent's personal bank account was

15   for investment and not for payment of legal fees.

16       In accordance with Respondent's instructions, the Randhawas invested $25,000 in AFL by

17   making three deposits in Respondent's bank accounts at Bank of America as follows:

18   | *Date of Deposit* | *Amount* | *Account No.* |
     |---|---|---|
19   | 11/18/96 | $ 9,000 | 05557-07176 (Respondent's personal account) |
20   | 11/18/96 | $ 9,000 | 05559-07175 (Khanna Foods account) |
21   | 11/19/96 | $ 7,000 | 05559-07175 (Khanna Foods account) |
22   | *Total* | *$25,000* | |

23   Respondent then left for India. On November 25, 1996, Respondent issued a check made payable

24   to himself from the Khanna Foods account in the amount of $4,000 for his Indian trip. (State Bar

25   exhibit 6, p. 47.)

26       While Respondent was in India, he called the Randhawas to tell them that they would have

27   //

28   //

-5-

1    to pay an additional $5,000 to $6,000 in cash in order to have an investment of ten lakhs[2] of Indian

2    Rupees.  When Respondent returned from India, the Randhawas paid Respondent the additional

3    $6,000 in cash as requested.  They had borrowed the money from Jagjit's father.

4             Between December 1996 and September 1997, AFL sent three letters to Jagjit, confirming

5    the receipt of his investment funds and promising the imminent issuance of stock certificates worth

6    20 lakhs shares.[3]

7             Despite Respondent's and AFL's repeated promises and Jagjit's constant inquiries regarding

8    AFL stock, to date, the Randhawas have not received a single stock certificate or any evidence of

9    their investment.

10            Contrary to Respondent's assertion that he set up the Khanna Foods account to receive

11    royalty payments from AFL and to pay any incidental expenses that Respondent as legal counsel for

12    AFL incurred, Respondent used the account to pay Respondent's personal bills and purchases.  In

13    December 1996, he paid $1,827 for a computer, $1,028.38 for another computer and $200 with a

14    notation "Happy Holiday," and $100 to Household Credit Services, Inc.  In January 1997, he paid

15    $330.97 to PacBell and $20 for a parking citation.

16            In 2001, after it became clear to the Randhawas that they were never going to receive a single

17    stock certificate or any evidence of their investment, the Randhawas hired attorney Bryant H. Byrnes

18    to assist them in recovering and/or obtaining an accounting of their investment funds. On June 29,

19    2001, Attorney Byrnes wrote to Respondent, asking for an accounting of the investment funds and

20    legal fees that the Randhawas had paid.[4]

21            On July 13, 2001, Respondent listed the Randhawas matters and stated that he had received

22    $2,100 in legal fees from the clients but that they still owed him about $19,000.[5]  However, he did

23    not provide an accounting of the fees or the investment funds.  Respondent further wrote:

---

25    [2]A lakh is a unit in Indian currency.

26    [3]State Bar exhibit 28, pp. 3, 4 and 6.

27    [4]State Bar exhibit 9, pp. 8-12.

28    [5]State Bar exhibit 9, p. 8.

1

> "Since June 1999, when I disassociated from Mr. Randhawa, he has repeatedly threatened and harassed me about his claimed investment in the Indian project. I have repeatedly told him to please show the receipts of the money which he claims he sent to India or deposited in my account for payment of fees."

2

3

4  In other word, Respondent was denying he had ever received the investment funds from the

5  Randhawas unless they had proof. Meanwhile, the $16,000 in the Khanna Foods account was

6  depleted by 2001.

7      On July 18, 2001, attorney Byrnes again wrote to Respondent requesting that Respondent

8  allow him an opportunity to see six Randhawas client files.[6] On August 7, 2001, Respondent replied

9  that these were closed files, he would have to locate them, and due to the press of business he would

10  not be able to do anything about the files until the end of August. On September 18, 2001, attorney

11  Brynes again requested that Respondent make available to him the Randhawas' files.[7] On September

12  21, 2001, Respondent replied:

13

> "I am extremely busy till the 15th of October, 2001. However, I can certainly send the copies of all the files ... which I have been able to locate. Those certainly belong to him and he has an absolute right to those files. I will charge you the going rate for copying and my time."[8]

14

15

16      Although Respondent replied, his answers were nonresponsive. Respondent did not return

17  the files or provide an accounting. In December 2001, attorney Byrnes assisted the Randhawas in

18  filing a complaint with the State Bar. When the State Bar wrote to Respondent in January 2002

19  about the return of the client files, he replied:

20

> "[T]his is the first time I have been requested to do so. Neither the Randhawas nor their attorney Mr. Byrnes had asked for the files to be sent."[9]

21

22      In the April 2002 response, Respondent wrote: "I did not know who to send the files to."

23  Respondent finally returned the files to attorney Byrnes in April 2002.

24  _____

25  [6]State Bar exhibit 9, p. 13.

26  [7]State Bar exhibt 9, p. 15.

27  [8]State Bar exhibit 9, p. 17.

28  [9]State Bar exhibit 11.

1              a.    Respondent's Contentions

2              Respondent denies that he had ever given the bank deposit slips to the Randhawas

3  or instructed them to make such deposits. He argues that those bank deposit slips must have been

4  stolen from his office because he had no idea how the Randhawas obtained access to those deposit

5  slips.

6              In a January 30, 2002 letter[10] to State Bar Complaint Analyst, Rebecca Foley,

7  Respondent wrote:

8              "The Randhawas never paid me $25,000 for a business investment.
               As Randhawas were my clients, they were strictly prohibited to invest
9                 money in any of my personal investments."

10  Respondent stated that on November 18, 1996, Jagjit called him after he deposited $9,000 in

11  Respondent's personal bank account as partial payment for his legal fees and $9,000 in the Khanna

12  Foods account and threatened that he was going to deposit another $16,000 into the Khanna Foods

13  account in the next few days. Respondent recalled being very upset that Jagjit deposited $9,000 for

14  investment in the Khanna Foods account. He also blamed the Randhawas for being "out of control

15  and uncooperative during their status as [his] clients." He "opted to withdraw as their counsel but

16  stayed on when they pleaded total ruin because of language and cultural barriers." He contended that

17  the Randhawas still owed him more than $19,000 in legal fees.

18              He further alleged in his January 2002 letter that once he sent the money to AFL, it

19  was AFL's responsibility to return the $16,000 to the Randhawas and that he had "nothing to do with

20  [Jagjit's] investment."[11] He also wrote: "Because of not being able to exercise any control over

21  Randhawas I closed both account sometimes in 1999."[12]

22              Respondent claimed that he told Jagjit that investing in AFL was absolutely forbidden

23

24
_____

25      [10]State Bar exhibit 11.

26      [11]In Respondent's January 30, 2002 letter to the State Bar, Respondent stated, "Since 1999, Mr.
    Randhawa has been enquiring about his investment in AFL. I have repeatedly told him that I have
27  nothing to do with his investment and that he should contact AFL directly." (State Bar exhibit 11.)

28      [12]State Bar exhibit 11.


-8-

1    and that on November 18, 1996, he sent Jagjit a letter to that effect.[13]   In the November letter,

2    Respondent warned Jagjit that he could not invest in any of Respondent's personal projects such as

3    the AFL. He admonished Jagjit not to invest any money in AFL. He also told Jagjit that he was

4    sending Jagjit's investment funds to India and would advise AFL not to allow Jagjit to invest and

5    to return the money. But the Randhawas testified that they never saw that letter.

6          In an April 11, 2002 follow-up letter to the State Bar,[14] Respondent purported to be

7    intrigued by Jagjit's knowledge of his personal and AFL accounts at Bank of America. He also

8    claimed that since Jagjit, on his own initiative, deposited the funds for investment, his fiduciary duty

9    as the attorney for AFL was to forward the money to AFL (which was their notice of the investment)

10   and request that AFL then return the money to the Randhawas.

11          At trial, Respondent testified that when he learned that the Randhawas had deposited

12   $16,000 into his Khanna Foods account, he asked his mother in India, who was a shareholder in

13   royalties to AFL, to give $16,000 to AFL. Respondent reckoned that once his mother transferred

14   $16,000 to AFL, the $16,000 in his Khanna Foods accounts was then his personal money. He further

15   testified that the $9,000 deposited in his personal account was for outstanding legal fees that the

16   Randhawas still owed.

17          The Court finds Respondent's contentions absolutely unbelievable and unreasonable

18   and rejects his fabricated stories. In particular, Respondent was at a loss to explain where his mother

19   obtained the $16,000 to give to AFL in India. Respondent told the Randhawas to pursue the refund

20   of their investment funds from AFL directly and not from him because he could not touch the funds

21   in the Khanna Foods account. Yet, he considered the $16,000 in the account as his personal money.

22          More important, the Court does not believe that the entity of AFL even existed.

23   Respondent has produced no independent reliable evidence, other than photocopies of uncertified

24   documents and letters from alleged officers of the company.

25          Assuming that AFL was incorporated in 1992 and the Khanna Foods account was

26

27          [13]State Bar exhibit 28, p. 2.

28          [14]State Bar exhibit 13.

1   opened in 1995 for the purpose of AFL doing business in United States, between the years 1996 and

2   1999, other than the Randhawas' $16,000 deposit in November 1996 and a $100 deposit in February

3   1997, the account had no other deposits during those three years. The balance ranged between

4   $22.41 in September 1996 and ($59.44) in January 1997, excluding the Randhawas' deposit.[15] By

5   May 1999, the balance was zero. Such a business account is clearly suspect. Respondent self-

6   righteously claimed that he had to close the bank accounts because the clients were out of control

7   when in fact, there were no other substantial transactions except for the $25,000 in November 1996.

8          Moreover, there is no evidence that the alleged letters from AFL were mailed from

9   India. The December 21, 1996, letter[16] from the Director of Finance of AFL, informing the

10  Randhawas that AFL received their investment of five Lakhs and 52,000 Rupees and that stocks and

11  shares would be issued in January 1997, was personally delivered to the Randhawas by Respondent.

12  Similarly, the September 19, 1997, letter,[17] informing the Randhawas that AFL was in the process

13  of issuing the class A preferred stock certificate worth 20 lakhs shares to the Randhawas, was also

14  personally delivered to the Randhawas by Respondent.

15         In February 2003, the State Bar investigator Alice Verstegen wrote letters to the

16  alleged officers of AFL in India – Financial Controller, the Secretary-Corporate Affairs and the Vice-

17  President of Human Resources – regarding the Randhawas' investment in AFL. She never received

18  replies from these individuals.[18] Instead, the State Bar received a letter from Chiter S. Khanna,

19  Respondent's brother and purportedly the chairman of AFL, dated September 12, 2003.[19] The letter

20  coincidentally corroborates Respondent's side of the story. But the suspicious letter was delivered

21  to the State Bar in an envelope without any postage markings and Verstegen was never able to track

22  down its origin of mailing. Respondent blamed the missing original envelope from India on the

23

24         [15]State Bar exhibit 6.

25         [16]State Bar exhibit 28, p. 3.

26         [17]State Bar exhibit 28, p. 6.

27         [18]State Bar exhibit 21.

28         [19]State Bar exhibit 27.

1   State Bar's destruction of evidence. Absent any evidence of tampering, the Court believes that

2   Respondent somehow had the letter delivered to the State Bar and not necessarily from India.

3           Chiter Khanna's letter contradicted the other alleged letters from AFL. He wrote that

4   AFL would immediately refund the money to the Randhawas as unsolicited funds for investment.

5   In fact, he stated that "we have made every possible effort from 1997 to 1999 to refund the funds to

6   Mr. Randhawa." While he indicated that the investment was prohibited and that its financial

7   department made an error regarding the issuance of the stock, there is no evidence of the alleged

8   October 18, 1997 follow-up letter correcting its error. He further claimed that AFL ceased

9   operations in 1999 and was in the process of liquidation, some five years later. In sum, the letter

10  conveniently supported Respondent's arguments without any credible evidence.

11          Finally, Respondent is supposedly the legal counsel for AFL, yet he could not produce

12  any certified copies of AFL's articles of incorporation. In fact, he could not produce any certified

13  copies of documents proving AFL's legal existence. Respondent may have had originally intended

14  AFL to be a legitimate business. Yet, it never got off the ground. AFL became a sham corporation,

15  unbeknownst to the Randhawas. But Respondent knew. Nevertheless, Respondent maintains that

16  the current status of AFL is good in 2004 even though AFL's chairman stated that they were in the

17  process of liquidation in 2003.

18  **C.    Conclusions of Law**

19      *1.    Count One: Avoiding Interests Adverse to a Client (Rules Prof. Conduct, Rule 3-*

20          *300)*[20]

21          Rule 3-300 provides that an attorney must not enter into a business transaction with a client

22  or knowingly acquire an interest adverse to a client unless the transaction or acquisition is fair and

23  reasonable to the client, is fully disclosed to the client, the client is advised in writing that the client

24  may seek the advice of an independent lawyer of the client's choice and is given a reasonable

25  opportunity to do so, and the client thereafter consents in writing to the transaction or acquisition.

26          The purpose of this rule is to "recognize the very high level of trust a client reposes in his

27

28          [20]References to rules are to the current Rules of Professional Conduct.

-11-

1   attorney and to ensure that that trust is not misplaced. [Citations.] Sadly, this case stands with too

2   many others as an example of an attorney's preference of his personal interests in manifest disregard

3   of the interests of his client." (*In the Matter of Kittrell* (Review Dept. 2003) 4 Cal. State Bar Ct.

4   Rptr. 615, 623.)

5         Respondent argues that he should not be responsible for a client's investment just because

6   he "also happens to be a stockholder in that company." (Respondent's Closing Arguments, 17:21-

7   24.) Such a cavalier attitude undermines the purpose of rule 3-300.

8         Respondent clearly failed to demonstrate that the dealings with the Randhawas were fair and

9   reasonable. (*Hunniecutt v. State Bar* (1988) 44 Cal.3d 362, 372-373.)

10        Respondent clearly and convincingly violated rule 3-300 by failing to comply with its

11  prophylactic requirements. Respondent knew that the terms of the business transaction were unfair

12  and unreasonable to the Randhawas in that they did not receive any evidence of their investment,

13  such as a stock certificate or promissory note. In fact, the Randhawas were never given any interest

14  in AFL. Also, the Randhawas' investment was not secured. Further, the transaction and its terms

15  were never fully disclosed and transmitted in writing to the Randhawas in a manner that should

16  reasonably have been understood by them. Moreover, the Randhawas were never advised in writing

17  that they should seek the advice of an independent lawyer of their choice nor were they given a

18  reasonable opportunity to seek the advice of an independent lawyer of their choice. Finally,

19  Respondent did not obtain written consent from the Randhawas to the terms of the transaction.

20  Thus, Respondent violated rule 3-300.

21        **2.     Count Two: Misappropriation (Bus. & Prof. Code, § 6106)**

22        Business and Professions Code section 6106[21] provides that the member's commission of an

23  act involving moral turpitude, dishonesty or corruption constitutes grounds for suspension or

24  disbarment.

25        The State Bar charges that Respondent, after receiving the Randhawas' $25,000 investment

26  funds, misappropriated those funds, thus committing acts of moral turpitude and dishonesty.

27  

28        [21]References to sections are to sections of the Business and Professions Code.

-12-

1    Respondent argues that he never asked the Randhawas to invest in AFL and that they

2    invested in AFL against his specific instructions not to do so. He further professes not to have any

3    idea of how the Randhawas got access to his deposit slips. He also alleges that the deposit slips were

4    stolen from his office while the Randhawas testified that he gave them specific depositing

5    instructions. Once the Randhawas deposited the money into his personal account and the Khanna

6    Foods account, Respondent then claims that the $9,000 in his personal account was for legals fees

7    that the Randhawas still owed him despite the fact that there were no outstanding fees. He asserts

8    that the $16,000 in the Khanna Foods account belonged to AFL and was nonrefundable to his clients.

9    He further tells a convoluted story of how his mother gave another $16,000 to AFL so that the

10   $16,000 remaining in the Khanna Foods account could be his personal money. As discussed earlier,

11   the Court finds Respondent's story unbelievable and rejects each of his fabrications.

12   In fact, Respondent engaged in a scheme to defraud the Randhawas out of their money by

13   luring them to invest in a nonexistent company and then spent their money on his personal expenses.

14   The promised stock certificates never materialized. Therefore, by misappropriating $31,000

15   advanced by the Randhawas, Respondent committed acts of moral turpitude and dishonesty in wilful

16   violation of section 6106.

17   **3.    Count Three:  Failure to Return Client Files (Rules Prof. Conduct, Rule 3-**

18   **700(D)(1))**

19   Respondent is charged with a violation of rule 3-700(D)(1), which provides that a member

20   whose employment has terminated must promptly release all papers and property to the client at the

21   request of the client.

22   Respondent contends that in January 2002 he had not sent the files to attorney Byrnes

23   because he did not know who to send the files to and was not sure if attorney Byrnes still represented

24   the Randhawas.[22] In his April 2002 letter to the State Bar, Respondent indicated that he still did not

25   know to whom to send the Randhawa files.[23] At trial he blamed attorney Byrnes for not calling him

26   _____

27   [22]State Bar exhibit 11.

28   [23]State Bar exhibit 13, p. 2.

1    to confirm whether attorney Byrnes wanted to view the files and for not sending him a letter of

2    authorization from the Randhawas. In other word, Respondent argues that he was in a fog as to what

3    to do with the files.

4         Contrary to Respondent's assertion, attorney Byrnes' repeated requests for the client files in

5    July and September 2001 constitute a sufficiently specific request under rule 3-700(D)(1).

6    Respondent clearly was aware of the obligation because he replied to those letters, albeit

7    nonresponsive, and admitted that Jagjit "has an absolute right to those files." After October 2001,

8    when Respondent failed to make the files available or send them to attorney Byrnes in a timely

9    manner, attorney Byrnes assisted the Randhawas in filing a complaint with the State Bar.

10        Finally, some ten months after the request, Respondent wrote to the State Bar and attorney

11   Byrnes on April 25, 2002,[24] that he was going to send the files to attorney Byrnes. In attorney

12   Byrnes' May 9, 2002 letter to the State Bar,[25] attorney Byrnes confirmed that he had received the

13   Randhawa files from Respondent. Respondent's failure to comply with attorney Brynes' July 18,

14   2001 request for the Randhawas files until late April 2002 is clear and convincing evidence that

15   Respondent is culpable of violating rule 3-700(D)(1). Respondent's defense of misunderstanding

16   is not justified.

17        **4.    *Count Four: Failure to Render Accounts (Rule 4-100(B)(3))***

18        Respondent is charged with a violation of rule 4-100(B)(3), which provides that a member

19   must maintain complete records of all funds, securities and properties of a client coming into the

20   possession of the member or law firm and render appropriate accounts to the client regarding them.

21        The Court finds, by clear and convincing evidence, that Respondent is culpable of violating

22   rule 4-100(B)(3). In response to attorney Brynes' request for an accounting of the investment funds

23   and legal fees, Respondent's July 13, 2001 letter did not contain a breakdown of the legal fees that

24   he had been paid. Instead, he simply listed the alleged total amount of legal fees received from his

25   clients and the total amount of outstanding fees in each matter. Moreover, Respondent attempted

26   _____

27        [24]State Bar exhibits 14 and 15.

28        [25]State Bar exhibit 16.

1   to deny that the Randhawas had ever made an investment in AFL. In fact, in that letter, Respondent

2   demanded that the Randhawas show him the receipts of money they had sent to India for investment

3   in AFL.

4         The Supreme Court noted the duty of an attorney to keep proper accounting books and client

5   transactions records so that the attorney could produce them and show fair dealing if the attorney's

6   actions were called into question. "The failure to keep proper books ... is in itself a suspicious

7   circumstance." (*Clark v. State Bar* (1952) 39 Cal.2d 161, 174.)

8         To date, the Randhawas have not received an accounting of the $31,000 they had invested

9   in AFL or their legal fees. Respondent's failure to render an accounting of the monies received from

10   the Randhawas constitutes a wilful failure to render an appropriate account of client funds within

11   the meaning of rule 4-100(B)(3). (See *In the Matter of Fonte* (Review Dept. 1994) 2 Cal. State Bar

12   Ct. Rptr. 752, 758.)

13        **5.**    ***Count Five: Misrepresentations to the State Bar Regarding Client Funds (Bus.***

14           ***& Prof. Code, § 6106)***

15         The State Bar charges that Respondent violated section 6106 by misrepresenting to and

16   misleading the State Bar regarding the disposition of the funds the Randhawas had given him in his

17   letters to the State Bar on January 30 and April 11, 2002.

18         In the January letter, Respondent stated that he "only had authority from AFL to use [the

19   Khanna Foods] account for payment of AFL incurred usual incidental expenses in the United States."

20   In the April letter, Respondent again claimed that the account "was strictly for expenses and other

21   related expenses incurred by [Respondent] as [AFL's] legal representative in the United States." In

22   fact, Respondent used the account to pay Respondent's personal bills and purchases, such as

23   computers and a parking citation.

24         Respondent also denied that he was responsible for the Randhawas' investment in AFL. He

25   wrote in the April letter to the State Bar, "Mr. Randhawas deposited the funds for investment

26   purposes and on his own initiative and volition. I never told him to do so."[26] Respondent further

27

28        [26]State Bar exhibit 13.

1    argued that the Randhawas had deposited the funds in Respondent's bank accounts without being

2    authorized to do so. "[T]hey were strictly prohibited to invest money in any of my personal

3    investments."[27]  He claimed that he had no knowledge of how the Randhawas knew about his

4    accounts when in fact, he gave them the deposit slips and instructed them to deposit installments of

5    less than $10,000 each time.  He told the State Bar that he would advise AFL not to allow the

6    Randhawas to invest and to return the money.  But AFL supposedly acknowledged receipt of the

7    funds, thanked the clients, and assured them the stock certificates were forthcoming.

8         Finally, he asserted that he had nothing to do with the investment funds and that the clients

9    had to seek a refund from AFL directly.  He feigned how upset he was upon finding out about the

10   investment.  Yet, he treated the $16,000 as his own personal funds and the $9,000 as payment for

11   legal fees.

12        Therefore, Respondent clearly committed acts of moral turpitude by making these false,

13   contradictory and misleading statements regarding the client funds to the State Bar in wilful violation

14   of section 6106.

15   **6.    Count Six:  Misrepresentations to the State Bar Regarding Client Files (Bus. &**

16   **Prof. Code, § 6106)**

17        Respondent is charged with violating section 6106 by making numerous misrepresentations

18   and misleading statements to the State Bar regarding the Randhawas' files.  In his January 2002 letter

19   to the State Bar, Respondent claimed that it was the "first time" he had heard the clients demanded

20   their files.  In fact, attorney Byrnes had been requesting them since July 2001.  Respondent also

21   asserted that he had offered attorney Byrnes "to see them at the time suitable to both of them."  On

22   the contrary, he told attorney Byrnes that he could send the copies of all the files and that he would

23   charge him the going rate for copying and Respondent's time for copying.  He also claimed that he

24   told attorney Byrnes that he could see the files anytime after October 15, 2001 but that he had not

25   heard from attorney Byrnes.

26        Arguably, because Respondent wrote "can certainly send" and not "will certainly send," it

27   _____

28        [27]State Bar exhibit 11.

1    was not definite that Respondent was going to forward the files to attorney Byrnes. At the same

2    time, he never directly told attorney Byrnes that the files were available for his review after October

3    15, 2001. After waiting five months without any success, attorney Byrnes reasonably decided that

4    rather than wasting time in a battle with Respondent to retrieve the files, he and his clients would

5    seek the State Bar's assistance. Even that took an additional five months since Respondent

6    continued to deny his unwillingness to release the files to his clients and blamed attorney Byrnes for

7    the inexcusable miscommunication. In his April 25, 2002 letter to the State Bar, Respondent insisted

8    that "[a]t no point in time anyone asked [him] to either <u>forward</u> or <u>send</u> the files to Mr. Byrnes."[28]

9           The Court finds his contentions groundless. He had clearly and convincingly violated section

10    6106 by misrepresenting to and misleading the State Bar that he had offered attorney Byrnes an

11    opportunity to review the client files but attorney Byrnes had chosen to ignore the opportunity. In

12    fact, it was Respondent who did not promptly release the files as requested.

13          *7.     Count 7: Failure to Cooperate With the State Bar (Section 6068(i))*

14          Section 6068(i) provides that an attorney must cooperate and participate in any disciplinary

15    investigation or proceeding pending against the attorney.

16          The State Bar alleges that Respondent failed to cooperate in a disciplinary investigation by

17    making false and misleading statements to the State Bar.

18          Because Respondent responded to the State Bar's letters, albeit untruthful, he did not

19    substantively violate the statute requiring him to cooperate with the State Bar's investigation of his

20    misconduct. His misrepresentations to the State Bar have already been found in violation of section

21    6106. Therefore, Respondent did not violate section 6068(i).

22                        **IV. <u>LEVEL OF DISCIPLINE</u>**

23    **A.    Factors in Mitigation**

24          Respondent bears the burden of proving mitigating circumstances by clear and convincing

25    evidence. (Rules Proc. of State Bar, tit. IV, Stds. for Atty. Sanctions for Prof. Misconduct, std.

26

27    _____

28          [28]State Bar exhibit 14.

-17-

1.2(e).)[29]  There is no compelling mitigating evidence.

Although Respondent has no record of prior discipline in his 17 years of practice when the misconduct began in 1996, his lack of record is not considered as mitigation because his present misconduct is deemed very serious.  (Std. 1.2(e)(i).)

The Court offered Respondent adequate opportunity to introduce mitigating factors, but he declined.  Although he listed at least 13 potential character witnesses and stated that more than 100 clients who were "ready, willing and able" to testify about his character, none testified on his behalf.

**B.    Factors in Aggravation**

There are many aggravating factors in this case.  (Std. 1.2(b).)

Respondent committed multiple acts of wrongdoing in abusing his position of trust for personal gain.  (Std. 1.2(b)(ii).)  He improperly solicited the Randhawas for investment, engaged in a scheme to defraud the clients, misappropriated about $31,000 from the Randhawas to his own use and benefit, failed to promptly return client files, failed to provide them with an accounting, and failed to avoid adverse interests.

Respondent's misconduct was clearly surrounded by bad faith, dishonesty and overreaching by misrepresenting to the clients that AFL was a profitable business venture and lured them to invest. They believed him because they considered him a friend, a fellow countryman who spoke their language.  When Respondent telephoned them from India, they believed that the investment was sound and a profit would be made.  Based on the trust and confidence that the Randhawas held for Respondent as their attorney and friend, they were willing to borrow money from Jagjit's father to satisfy Respondent's request for the final investment.  But after they invested, he told them that he could not refund the monies because of his fiduciary duty owed to AFL and that they had to recover the funds from AFL directly.  Then he converted the funds to his own use.  At trial, Respondent attempted to slander the Randhawas' character, insisted that their investment was forbidden and denied ever persuading them to invest.  He claimed the $16,000 became his own personal funds because his mother in India paid AFL the $16,000.  (Std. 1.2(b)(iii).)

---

[29]All further references to standards are to this source.

1    Furthermore, Respondent failed to provide any fee agreement to the Randhawas even though

2    the fees exceeded $1,000. (Bus. & Prof. Code, § 6148.) This uncharged misconduct is considered

3    as further aggravation. (Std. 1.2(b)(iii).)

4    Respondent's misappropriation of $31,000 caused the Randhawas substantial harm. (Std.

5    1.2(b)(iv).) The clients hold working class jobs with limited financial means. Despite their many

6    requests for a refund or an accounting of their investment, Respondent has not returned the money

7    to the Randhawas.

8    Respondent demonstrated indifference toward rectification of or atonement for the

9    consequences of his misconduct. (Std. 1.2(b)(v).) He refuses to admit to any wrongdoing, despite

10    the clear and convincing evidence, and has never reimbursed any of the funds misappropriated from

11    the clients. Instead, he insists that the Randhawas were to blame for their financial loss and that

12    Respondent was the victim of the Randhawas' dishonesty.

13    Respondent displayed a lack of cooperation to the Randhawas. (Std. 1.2(b)(vi).) His lack

14    of candor to the State Bar has already been found as a violation of section 6106. More significantly,

15    Respondent's misrepresentations at trial and in his closing brief are further aggravating. "Under

16    certain circumstances, false testimony before the State Bar may constitute an even greater offense

17    than misappropriation of clients' funds." (*Doyle v. State Bar* (1982) 32 Cal.3d 12, 23.) Here,

18    Respondent's testimony regarding the existence of AFL, his inability to refund the investment funds,

19    the incredible letters and documents from alleged officers of AFL, the theft of the deposit slips, and

20    so on, was deliberately false. His lack of candor is a strong aggravating circumstance.

## V. DISCUSSION

22    The purpose of State Bar disciplinary proceedings is not to punish the attorney, but to protect

23    the public, to preserve public confidence in the profession and to maintain the highest possible

24    professional standards for attorneys. (*Chadwick v. State Bar* (1989) 49 Cal.3d 103, 111; *Cooper v.*

25    *State Bar* (1987) 43 Cal.3d 1016, 1025; Std. 1.3.)

26    This case involves misappropriation of about $31,000, fraud, failure to release client files,

27    failure to render accounts, failure to avoid adverse interests, and repeated misrepresentations to the

28    State Bar. The standards for Respondent's misconduct provide a broad range of sanctions ranging

1  from reproval to disbarment, depending upon the gravity of the offenses and the harm to the client.

2  (Stds. 1.6, 2.2(a), 2.3, 2.8, and 2.10.)  The standards, however, are only guidelines and do not

3  mandate the discipline to be imposed. (*In the Matter of Moriarty* (Review Dept. 1990) 1 Cal. State

4  Bar Ct. Rptr. 245, 250-251.) "[E]ach case must be resolved on its own particular facts and not by

5  application of rigid standards." (*Id.* at p. 251.)

6        Standard 2.2(a) provides that culpability of wilful misappropriation of entrusted funds shall

7  result in disbarment, unless the amount is insignificantly small or the most compelling mitigating

8  circumstances clearly predominate.  Here, Respondent's misappropriation of about $31,000 is

9  significant and there is no compelling mitigation.

10        Standard 2.3 provides that culpability of moral turpitude and intentional dishonesty toward

11  a court or a client shall result in actual suspension or disbarment.  As discussed above, Respondent's

12  misappropriation was an act of moral turpitude and his incredible justification for his action to the

13  Court is dishonest.

14        In his closing arguments,[30] Respondent maintains that he did no wrong.  Instead, he charges

15  that the State Bar and attorney Byrnes had filed a false and malicious complaint against him and

16  withheld and fabricated evidence.  Respondent attacks the integrity of the State Bar and attorney

17  Byrnes and attempts to vilify his clients' credibility and character with tangent reasoning and

18  unsubstantiated allegations (i.e. prosecutorial misconduct, evil plot, immigration fraud, terrorists

19  connection, and violent behavior.)  Respondent contends that it is the State Bar who "must be

20  properly punished for subjecting Respondent to such rigorous pressure and hardship for the past

21  three years.  OCTC must be made to answer for fabricating and suppressing the evidence and for

22  making its witnesses knowingly perjure themselves under the laws of the State of California."

23  (Respondent's Closing Arguments, 18:1-6.)

24        The State Bar, on the other hand, urges a minimum of two years actual suspension for

25  Respondent's misconduct of misappropriation and misrepresentations, particularly since Respondent

26

27

      [30]Respondent's exhibit FFF attached to his Closing Arguments is not admitted into evidence as it
28  was introduced after the trial.

-20-

1    took advantage of immigrants clients who had extremely limited financial means, a significant

2    language barrier, and virtually no business and investment experience. The State Bar has cited

3    several cases in support of its disciplinary recommendation, including *In the Matter of Kittrell*

4    (Review Dept. 2003) 4 Cal. State Bar Ct. Rptr. 615, *Rose v. State Bar* (1989) 49 Cal.3d 646, *Beery*

5    *v. State Bar* (1987) 43 Cal.3d 802, and *In the Matter of Peavey* (Review Dept. 2002) 4 Cal. State Bar

6    Ct. Rptr. 483, and *In the Matter of Johnson* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 233.

7        The Court finds Respondent's arguments without merit and his misconduct significantly

8    more outrageous than that of the attorneys in *Kittrell, Rose, Beery, Peavey or Johnson*. Moreover,

9    Respondent presented no mitigating evidence even though he had been in practice for 25 years.

10        In *Kittrell*, the attorney, who had been in practice for 24 years, was actually suspended for

11   three years for entering into a real estate transaction with an unsophisticated client who lost her life

12   savings of $61,000 in the transaction. The attorney concealed material facts and known risks from

13   his client about the investment. Instead, he told the client that it was a "can't lose" investment.

14        In the other cases cited by the State Bar, those attorneys were actually suspended for two

15   years for persuading vulnerable clients to invest in failed businesses without disclosing significant

16   risks and abused the trust placed in them by their clients.

17        Here, at the time Respondent seduced his clients to invest in a high risk business, Respondent

18   knew or should have known that the business was a sham. The company was alleged to be

19   incorporated in 1992; the Khanna Foods account was never adequately funded, other than with the

20   Randhawas' money; the company was supposed to be liquidated in 2003, some 11 years later

21   without ever having done any business; and at trial, Respondent testified that the current status of

22   AFL was good and that "in a year or two might be very good." Respondent's misrepresentations

23   continue.

24        To further aggravate his misconduct, he advances his fraudulent and contrived

25   misrepresentations before this Court by maligning the character and integrity of his clients, attorney

26   Brynes and Deputy Trial Counsel Albertsen-Murray, by producing uncertified documents and alleged

27   letters from AFL's officers, by asserting that the $25,000 is now his and by denying ever having

28   received the additional $6,000 from the Randhawas.

-21-

1    Respondent's misconduct reflects a blatant disregard of professional responsibilities. He

2  clearly has shown no insight into his wrongdoing. He had flagrantly breached his fiduciary duties

3  to the Randhawas and abused their trust as their attorney. When he told them that AFL was a

4  lucrative business venture and that he needed the funds before his trip to India, the Randhawas

5  believed him. Respondent exploited the Randhawas' trust, lack of business experience and high

6  hope for a profitable return of their investment. He has refused to accept responsibility for his

7  misconduct and has done nothing to rectify the harm he has caused.

8    It is settled that an attorney-client relationship is of the highest fiduciary character and always

9  requires utmost fidelity and fair dealing on the part of the attorney. (*Beery v. State Bar* (1987) 43

10  Cal.3d 802, 813.) The Supreme Court noted that "[t]he essence of a fiduciary or confidential

11  relationship is that the parties do not deal on equal terms, because the person in whom trust and

12  confidence is reposed and who accepts that trust and confidence is in a superior position to exert

13  unique influence over the dependent party." (*Id.*)

14    The misappropriation of client funds is a grievous breach of an attorney's ethical

15  responsibilities, violates basic notions of honesty and endangers public confidence in the legal

16  profession. In all but the most exceptional cases, it requires the imposition of the harshest discipline

17  – disbarment. (*Grim v. State Bar* (1991) 53 Cal.3d 21.) In *Kaplan v. State Bar* (1991) 52 Cal.3d

18  1067, the Supreme Court disbarred an attorney who intentionally misappropriated $29,000 from his

19  law firm. In *In the Matter of Spaith, supra,* 3 Cal. State Bar Ct. Rptr. 511, the attorney was disbarred

20  for misappropriating $40,000 from a client's personal injury settlement funds and misled the client

21  over a year as to the status of the money.

22    In a similar case, *In the Matter of Priamos* (Review Dept. 1998) 3 Cal. State Bar Ct. Rptr.

23  824, the attorney engaged in business transactions with a client and committed acts of moral

24  turpitude by his seven year self-dealing with over $500,000 of investment funds he was asked by his

25  client to handle, which included the attorney unilaterally paying himself nearly $450,000 in

26  management and legal fees. The attorney's failure to demonstrate an appreciation of misconduct or

27  learn from his extended period of overreaching of his vulnerable client was a significant aggravating

28  factor to disbar him.

1    In this case, it has been almost eight years since the Randhawas gave Respondent $31,000

2  for investment. Respondent unilaterally declares $9,000 as payment for outstanding legal fees and

3  $16,000 as his own funds and denies receipt of the remaining $6,000. He has no accounting to

4  evidence any outstanding legal fees owed by the Randhawas; no banking statements to support the

5  banking transactions among AFL, his mother and the Khanna Foods account; and no certified

6  documents of AFL as a legitimate corporation or a viable business entity. Like the attorney in

7  *Priamos*, Respondent has no insight into his misconduct.

8    Moral turpitude is defined as "an act of baseness, vileness or depravity in the private and

9  social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted

10  and customary rule of right and duty between man and man." (*In re Higbie* (1972) 6 Cal.3d 562,

11  569.) Respondent has clearly and wilfully committed multiple acts of moral turpitude.

12    In recommending discipline, the "paramount concern is protection of the public, the courts

13  and the integrity of the legal profession." (*Snyder v. State Bar* (1990) 49 Cal.3d 1302.) "It is clear

14  that disbarment is not reserved just for attorneys with prior disciplinary records. [Citations.] A most

15  significant factor . . . is respondent's complete lack of insight, recognition, or remorse for any of

16  his wrongdoing. To the present time, he accepts no responsibility for what happened and only seeks

17  to blame others." (*In the Matter of Wyshak* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 70, 83.)

18  An attorney's failure to accept responsibility for actions which are wrong or to understand that

19  wrongfulness is considered an aggravating factor. (*Carter v. State Bar* (1988) 44 Cal.3d 1091, 1100-

20  1101.)

21    In this matter, the aggravating circumstances are significant. Although the Court had

22  encouraged Respondent to provide mitigating evidence, he produced none. Respondent's refusal

23  to return funds to the Randhawas, significant client harm and continuous failure to comprehend basic

24  adherence to fiduciary duties owed to clients warrant the highest level of public protection. Instead

25  of recognizing his wrongdoing, Respondent went to great length during his testimony to deny his

26  misconduct and blamed his clients for giving him the money. He insists that he was the victim, not

27  his clients.

28    While the Randhawas may have had personal problems in the past, those issues are irrelevant

1  to Respondent's misappropriation of their $31,000 investment funds, failure to promptly return their

2  files, failure to render an accounting, failure to advise his clients regarding an adverse interest, failure

3  to provide the clients with a fee agreement for fees exceeding $1,000, and making repeated

4  misrepresentations to the State Bar. In other word, the clients' problems do not justify Respondent's

5  professional misconduct or preying upon their vulnerability as Indian immigrants.

6       Respondent's acts of dishonesty "manifest an abiding disregard of the fundamental rule of

7  ethics – that of common honesty – without which the profession is worse than valueless in the place

8  it holds in the administration of justice." (*Levin v. State Bar* (1989) 47 Cal.3d 1140, 1147.)

9       The Supreme Court has repeatedly noted "that deception of the State Bar may constitute an

10  even more serious offense than the conduct being investigated." (*Franklin v. State Bar* (1986) 41

11  Cal.3d 700, 712.) In *Olguin v. State Bar* (1980) 28 Cal.3d 195, the Supreme Court increased the

12  recommended attorney's discipline from 90 days to six months not only because of his dereliction

13  of duty to his client resulting in the action being dismissed but, particularly, also because of his

14  deceptive conduct on at least two occasions – lying to a State Bar investigator about that client

15  matter, fabricating documents for his defense, and continuing to assert their authenticity after

16  learning of their bogus nature.

17       Here, Respondent's misrepresentations to the State Bar investigator and before this Court are

18  more egregious than those of the attorney in *Olguin* and thus, merit a more severe degree of

19  discipline in light of his other offenses. (See *Worth v. State Bar* (1978) 22 Cal.3d 707, [disbarment

20  for an attorney who misappropriated client funds and presented false and fabricated testimony to the

21  State Bar – misrepresentations which he continued to make before the Supreme Court].)

22       After considering his reprehensible misconduct compounded by his presentation of false and

23  fabricated testimony and evidence, the Court concludes that an actual suspension of two or three

24  years is inadequate to protect the public, to preserve public confidence in the profession and to

25  maintain the highest possible professional standards for attorneys. The "public is therefore at great

26  risk unless Respondent is required to successfully complete a reinstatement proceeding before again

27  being allowed to practice law in this state." (*In the Matter of Priamos, supra,* 3 Cal. State Bar Ct.

28  Rptr. 824, 830.)

1  Respondent "is not entitled to be recommended to the public as a person worthy of trust, and

2  accordingly not entitled to continue to practice law." (*Resner v. State Bar* (1960) 53 Cal.2d 605,

3  615.) Therefore, based on the severity of the offenses, the serious aggravating circumstances and

4  the lack of mitigating factors, the Court recommends disbarment.

5  ## VI. RECOMMENDED DISCIPLINE

6  This Court recommends that Respondent **PADAM KUMAR KHANNA** be disbarred from

7  the practice of law in the State of California and that his name be stricken from the rolls of attorneys

8  in this State.

9  It is also recommended that the Supreme Court order Respondent to comply with rule 955,

10  paragraphs (a) and (c), of the California Rules of Court, within 30 and 40 days, respectively, of the

11  effective date of its order imposing discipline in this matter.

12  ## VII. COSTS

13  The Court recommends that costs be awarded to the State Bar pursuant to Business and

14  Professions Code section 6086.10 and payable in accordance with Business and Professions Code

15  section 6140.7.

16  ## VIII. ORDER OF INVOLUNTARY INACTIVE ENROLLMENT

17  It is ordered that Respondent be transferred to involuntary inactive enrollment status pursuant

18  to Business and Professions Code section 6007(c)(4) and rule 220(c) of the Rules of Procedure of

19  the State Bar. The inactive enrollment shall become effective three calendar days after service of

20  this order.

21

22

23

24  Dated:  October 20, 2004

**PAT McELROY**
Judge of the State Bar Court

25

26

27

28

-25-

# CERTIFICATE OF SERVICE
### [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on October 21, 2004, I deposited a true copy of the following document(s):

### DECISION AND ORDER OF INVOLUNTARY INACTIVE ENROLLMENT

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

> **PADAM KUMAR KHANNA**
> **KHANNA & NARAIN**
> **2600 10TH ST**
> **BERKELEY, CA 94710-2522**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **TAMMY ALBERTSEN-MURRAY, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on October 21, 2004.

George Hue
Case Administrator
State Bar Court

Certificate of Service.wpt

**EXHIBIT B**

1  PADAM K. KHANNA, S.Bar Number 85229
   2600 Tenth Street
2  Berkeley, California 94710-2522
   Tele: 510-524-6181
3  Fax: 510-549-2832

4  Attorney Pro Per

5                      THE STATE BAR COURT

6              REVIEW DEPARTMENT  - SAN FRANCISCO

7

8  In the Matter of,              Case No.: No. 02-O-11383-PEM

9  PADAM KUMAR KHANNA,                REVIEW DEPARTMENT

10 No. 85229, A Member of the State Bar,   REQUEST FOR REVIEW

11           Respondent

12

13

14

15                RESPONDENT'S REQUEST'S FOR REVIEW

16      Pursuant to Rule 301 of Rules of Procedure of the State Bar of

17 California, Respondent Padam K. Khanna requests a review of the ruling by

18 hearing Judge P. McElroy in the above-mentioned matter.

19      Enclosed is the Transcript Order Form, duly completed along with a

20 check for $3,000 (estimated by the State Bar). These transcripts are

21 necessary for filing a brief before the Review Department as some of the

22 audio CDs of the proceedings did not work.

23                      Respectfully submitted

24                      _Padam K. Khanna_ (signature)

25                      Padam K. Khanna

Date: NOV. 18, 2009

RESPONDENT'S REQUESTS FOR REVIEW  - 1

PROOF OF SERVICE

I am employed in the City of Berkeley, County of Alameda, California.  My address is
736 Grizzly Peak Boulevard, Berkeley, California 94708.  I am over the age of eighteen
years.

Today, I served the attached document,

RESPONDENT'S REQUEST FOR REVIEW

by placing the true and correct copies of the above documents in a sealed and stamped
first class mail envelop, postage paid in the mail box on  Nov. 18, 2004
to:

> Ms. Tammy Albertsen-Murray
> Deputy Trial Counsel
> Office of the Chief Trial Counsel
> 180 Howard Street
> San Francisco, CA 94105-1639

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct and this declaration was executed on  Nov. 18, 2004.

CANDACE KHANNA

**EXHIBIT C**

**FILED**

JUN 0 2 2005

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

## REVIEW DEPARTMENT OF THE STATE BAR COURT

| | | |
|---|---|---|
| In the Matter of | ) | 02-O-11383 |
| | ) | |
| PADAM K. KHANNA | ) | ORDER |
| | ) | |
| A Member of the State Bar | ) | |
| | ) | |

Portions of the audio-taped trial proceedings that occurred on August 18, 2004, in this matter are not discernable and could not be transcribed. It appears that part of the testimony of one witness, Jagget Randhawa, is missing. In addition, other courtroom rulings or determinations may have taken place. The parties were unable to stipulate to what occurred during the missing portion. After careful review and analysis of the audio-taped recording, the Court concludes that no transcribable recording was made of the courtroom proceeding during that time.

Accordingly, this matter is remanded to the hearing department for the limited purpose of re-taking the missing testimony of the witness and for such other proceedings as the hearing judge deems relevant to complete the missing record of the trial court proceedings and to effectuate this order. The review department requests that this matter be expedited.

_____
Presiding Judge

**EXHIBIT D**

FILED

NOV 14 2005

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

## REVIEW DEPARTMENT OF THE STATE BAR COURT

|  |  |  |
|---|---|---|
| In the Matter of | ) | 02-O-11383 |
|  | ) |  |
| PADAM KUMAR KHANNA, | ) |  |
|  | ) | ORDER |
| A Member of the State Bar. | ) |  |
|  | ) |  |

After the review department's order of remand, the hearing judge held a hearing on August 3, 2005, to re-take the missing portion of the testimony of the witness Jagjit Randhawa. The transcripts of the trial proceedings and the file in this matter have now been returned to the review department. Accordingly, within 45 days after service of this order respondent Padam Kumar Khanna is ordered to file with the clerk and serve an opening brief which complies with Rules of Procedure of the State Bar, rule 302. The filing of subsequent briefs will be governed by Rules of Procedure of the State Bar, rule 303.

_____
Presiding Judge

**EXHIBIT E**



FILED

SEP 16 2005

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

# REVIEW DEPARTMENT OF THE STATE BAR COURT

## IN BANK

| | | |
|---|---|---|
| In the Matter of | ) | 02-O-11383 |
| | ) | |
| Padam Kumar Khanna, | ) | ORDER |
| | ) | |
| A Member of the State Bar. | ) | |
| | ) | |

The petition for interlocutory review filed by respondent Padam Kumar Khanna on July 14, 2005, is denied, the Review Department noting that petitioner may present his claims as appropriate in his pending plenary review from the hearing judge's disciplinary decision.

_____
Presiding Judge

# CERTIFICATE OF SERVICE
## [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on September 16, 2005, I deposited a true copy of the following document(s):

## ORDER FILED SEPTEMBER 16, 2005

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

   **PADAM K KHANNA**
   **KHANNA & NARAIN**
   **2600 10TH ST**
   **BERKELEY, CA   94710 - 2522**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

   **TAMMY M. ALBERTSEN-MURRAY, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on **September 16, 2005**.

**Rosalie Ruiz**
Case Administrator
State Bar Court

**EXHIBIT F**

**FILED**

NOV 29 2005

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

# REVIEW DEPARTMENT OF THE STATE BAR COURT

## IN BANK

| | | |
|---|---|---|
| In the Matter of | ) | 02-O-11383 |
| | ) | |
| PADAM KUMAR KHANNA, | ) | |
| | ) | ORDER |
| A Member of the State Bar. | ) | |
| | ) | |

The motion to retransfer to active status is denied, the Review Department noting that it has previously issued the following briefing schedule based on Khanna's earlier-filed request for plenary review: within 45 days after service of the Review Department's order of November 14, 2005, Khanna is to file with the clerk and serve an opening brief which complies with Rules of Procedure of the State Bar, rule 302. The filing of subsequent briefs is to be governed by Rules of Procedure of the State Bar, rule 303.

_____
Presiding Judge

# CERTIFICATE OF SERVICE
## [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on November 29, 2005, I deposited a true copy of the following document(s):

### ORDER FILED NOVEMBER 29, 2005

in a sealed envelope for collection and mailing on that date as follows:

[X]   by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

**PADAM K KHANNA**
**KHANNA & NARAIN**
**2600 10TH ST**
**BERKELEY, CA   94710 - 2522**

[X]   by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

**TAMMY M. ALBERTSEN-MURRAY, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on **November 29, 2005**.

**Rosalie Ruiz**
Case Administrator
State Bar Court

**EXHIBIT G**

Padam K. Khanna, S.B. #85229
2600 Tenth Street
Berkeley, CA 94710

Tel:  510-549-2786
Fax: 510-549-2832
e-mail: pkhanna@pacbell.net

THE STATE BAR COURT

REVIEW DEPARTMENT

In the Matter of,                                    )    Case No.: 02-O-11383-PEM
                                                     )
PADAM KUMAR KHANNA, No. 85229,                       )    NOTICE OF WITHDRAWAL OF
                                                     )    REQUEST FOR REVIEW IN WHOLE.
A Member of the State Bar,                            )    RULES  1310 (a) AND (c)  OF RULES OF
                                                     )    PRACTICE OF THE STATE BAR OF
            Respondent                               )    CALIFORNIA.
                                                     )
                                                     )    AND
                                                     )
                                                     )    REQUEST FOR TRANSMISSION OF
                                                     )    STATE BAR COURT'S ENTIRE RECORD
                                                     )    OF PROCEEDINGS TO THE SUPREME
                                                     )    COURT AS SOON AS POSSIBLE.

        Pursuant to California State Bar Rules of Practice, rules 1310 (a) and (c) Respondent

submits this Notice of Withdrawal of Request for Review of the decision of the Hearing

Department made on November 3, 2004.

        This motion is based upon the Review Department's order of November 29, 2005

wherein the Review Department denied Respondent's motion for expedited hearing and of

setting the matter on a regular track.

        Respondent cannot petition the Supreme Court for a review without exhausting his

administrative remedies. It has already taken over thirteen months for this case and it has not

even reached the Review Department.  There is no guarantee that this case would not take

another thirteen months in the Review Department as the matter has been put on a regular

course of review.

It is also requested that the Review Department adopt the hearing department's decision

as the final decision of the State Bar Court and transmit all the records of the proceedings to

the Supreme Court *as soon as possible,* pursuant to business and Professions Code section

6081. See *In Re Rose*, (2000) 22 Cal.4th 430 at 439.

Date December 29, 2005                    Padam K. Khanna

PROOF OF SERVICE
[C.C.P. Section 1013, 2015.5, 2009]

I, the undersigned, declare that I am a citizen of the United States, a resident of the State of California, and am employed in the County of Alameda. I am over the age of eighteen years of age and not a party to the above-entitled action. My address is 736 Grizzly Peak, Berkeley, California. I served the following documents in the manner below on the person(s) listed below:

NOTICE OF WITHDRAWAL OR REQUEST FOR REVIEW IN WHOLE AND REQUEST FOR TRANSMISSION OF STATE BAR PROCEEDINGS TO THE SUPREME COURT

By messenger and causing personal delivery of the documents listed above to the persons addresses as follows:

> The Review Department
> 180 Howard Street
> San Francisco, CA 94105
> (5 copies)

1. Tammy Albertsen-Murray
   180 Howard street
   San Francisco, CA 941052

I declare under the penalty of perjury under the laws of the State of California that the above is true and correct. Executed this 29th day of December, 2005 at Berkeley, CA 94708

Candace D. Khanna