**EXHIBIT H**

Supreme Court Case No. S141019

# IN THE SUPREME COURT

## OF THE

## STATE OF CALIFORNIA

PADAM KUMAR KHANNA

       Petitioner

v.

STATE BAR OF CALIFORNIA

       Respondent

---

Petition for Writ of Review

From the State Bar Court Decision, Case Number 02-O-11383

---

Petitioner's supporting Brief
And
Emergency Request for Stay of Hearing Department State Bar Court Order of

Involuntary Inactive Enrollment Dated: October 21, 2004

---

Padam K. Khanna
2600 Tenth Street
Berkeley, California 94710-2522
(T) 510-549-2786
(F) 510-549-2832
Email: pkhanna@pacbell.net

# TABLE OF CONTENTS

EXPLANATION OF ABBREVIATIONS

PETITION FOR WRIT OF REVIEW

EXHAUTION OF STATE BAR COURT REVIEW          ...

GROUNDS FOR REVIEW                    ...          ...

WHY REVIEW IS APPROPRIATE              ...    ...

TABLE OF AUTHORITIES          ...        ...

STANDARD OF REVIEW          ...        ...

STATEMENT OF CASE                      ...

STATEMENT OF FACTS        ...        ...        ...

ISSUES PRESENTED : LEGAL ARGUMENTS AND ANALYSIS      ...

## PART ONE

I.. COUNT ONE: *Avoiding Interests Adverse to a Client (Rules Prof. Conduct, Rule 3-300*

A. Burden of Proof As to Solicitation:

B. Burden of Proof As to Three Deposit Slips:

C. State Bar Exhibit 28, p.4:- Letter from Financial Controller, AFL-India, Dated January 31, 1997

D. Burden of Proof As to AFL's Existence:

E. Burden of Proof As to the Letters from AFL:

F. State Bar Exhibit 28, P. 3. Letter from Director of Finance, AFL, Dated December 21, 1996

i

II. COUNT TWO:: *Misappropriation (Bus. & Prof. Code, § 6106):*

III. COUNT THREE: *Failure to Return Client Files (Rules of Prof. Conduct, Rule 3-700(D)(1)*

IV.. COUNT FOUR: *Failure to Render Accounts (Rule 4-100(B)(3)*

V.: COUNT FIVE: *Misrepresentation to the State Bar regarding Client Funds (Bus. & Prof. Code, § 6106)*

VI. PROSECUTORIAL MISCONDUCT

    A. SPOLIATON OF EXCULPATORY EVIDENCE
        1. DHL Cover Letter
        2. The Third Deposit Slip: personal account

    B. WITNESS TAMPERING

    C. SUPPRESSION OF EXCULPATORY PHONE CONVERSATION OF DTC WITH SUPERIOR COURT JUDGE HONORABLE JULIE CONGER:

VII, RIGHT TO COUNSEL

VIII. ADEQUACY OF NOTICE

IX. PERJURY

X. DELAY

XI. CONCLUSION

XII. CERTIFICATION

XIII. VERIFICATION

# TABLE OF AUTHORITIES

## CASES

**Federal Cases:**

1. *Banks v. Dretke* (2004) 000 U.S. 02-1603.                33
2. *Bowsher v. Synar*, (1986) 478 U.S. 714.
3. *Brady v. Maryland* (1963) 373 U.S. 83                32
4. *Buckley v. Valeo* (1976) 424 U.S. 1
5. *United States v. Agurs* (1976) 478 U.S.714                32
6. *Commonwealth of the Northern Mariana Islands v. Bowie* (2001) 236 F. 3d 1083.

**California Cases:**

1. *Baker v. State Bar* (1989) 49 Cal. 3d 804, 816.                44
2. *Bledsoe v. State Bar* (1991) 52 Cal. 3d 1074, 278 Cal. Rptr. 80, 804 P. 2d 705.,
3. *Cabe v. Superior Court* (1998) 63 Cal. App. 4th 732, 735, 74 Cal. Rptr. 2d 331.                48
4. *Cedars-Sinai Medical Center v. Superior Court (Bowyer)* (1998) 18 Cal. 4th 1, 74 Cl. Rptr. 2d 294.                30
5. *Chadwick v. State Bar* (1989) 49 Cal.3d 103, 776 P.2d 240, 260 Cal.Rptr. 538.
6. *Conway v. State Bar* (1989) 47 Cal. 3d 1107, 255 Cal.Rptr.390, 767 P. 2d 657                3
7. *Emslie v. State Bar* (1974) 11 Cal.3d 210                43
8. *Fickett v. Rauch*, 31 Cal. 2d at 111-112.

9.  *Gates v. Department of Motor Vehicles* (1979) 94 Cal.App.3d 921 ,
    15Cal.Rptr.791.                                      53

10.  *Gendron v. State Bar* (1983) 35 Cal. 3d 409.

11.  *Guzzetta v. State Bar* (1987) 43 Cal. 3d 962,968.          44

12.  *In re Attorney Discipline System*, (1998) 19 Cal.4th at pp.592-593, 79
     Cal.Rptr. 2d 836, 967 P. 2d 49.                      3

13.  *In re Craig* (1939) 12. Cal. 2d 93,97.

14.  *In re Hallinan* (1954) 43 Cal. 2d 243.

15.  *In re Higbie* (1972) 6 Cal.3d 891, 196 Cal. Rptr. 509.

16.  *In re Jackson* (1992) 3 Cal. 4th 578, 11 Cal. Rptr. 2d 531.

17.  *Jacobson v. Gourley* (2000) 83 Cal. App. 4th 1331, 100 Cal. Rptr.2d
     349,

18.  *In re Rose* (2000) 22 Cal. 4th 430, 93 Cal. Rptr. 2d 298.      3

19.  *In re Strick* (1983) 34 Cal. 3d 891, 196 Cal. Rptr. 509

20.  *Maltaman v. State Bar* (1987) 43 Cal. 3d 962.          44

21.  *Marine Forests Society et al. v. California Coastal Commission* (2005)
     36 Cal.4th 1 at 59.

22.  *Obrien v. Jones* (2000) 23 Cal. 4th 40, 999 P. 2d 100      3

23.  *People v. Howard* (1993) 17 Cal. App. 4th 999, 21 Cal. Rpytr. 2d 676.
                                                          48

24.  *People v. Perkins* (2003) 109 Cal. App. 4th 1562, 1 Cal. Rptr 3d 271.
                                                          24

25.  *People v. Sturm* (March 6, 2006) Cal. Supreme Court No. 031423.
                                                          2

26.  *People v. Thomas* (1987) 43 Cal. 3d 818.          43

27.   *Sargent Flecther, Inc. v. Able Corporation* (2003) 110 Cal. App. 4th
      1658.                                                    16

28.   *Weinstein v. E.F. Hutton & Co.* (1990) 220 Cal.App. 3d 364, 269
      Cal.Rptr. 443).

29.   *Weisbecker v. Weisbecker* (1945) 71 Cal.App.2d 41, 47-48 [161 P.2d
      990]1658.

30.   *Werner v. State Bar* (1944) 24 Cal.2d 611, 615.

31.   *Woodard v. State Bar* (1940) 16 Cal.2d 755                 44

**Statutes:**

California Business and Professions Code:

Section 6007(c)(4)                              1

Section 6106                          24, 27 and 28

California Evidence Code:

Section 500

Section 550

Section 641

California Code of Civil Procedure

Section

Section 914

**U. S. Constitution:**

Fourteenth Amendement

Sixth Amendment

**California Constitution:**

Article Vi, section 1

**Rules of Procedure State Bar of California:**

Rule 220 (c)                              1

**Rules of Professional Conduct:**

Rule 3-300                              14

Rule 3-700(D)(1)                        25

Rule 4-100(B)(3)                        26

**Rules of Court:**

Rule 952 (a)

Rule 954 (a) (1) (2) (3) (4) (5)

**Law Review:**

*Presumptions and Burden of Proof:*
*Conforming the California Evidence Code to the Federal Rules of*
*Evidence, Professor Mendez, U.S.F.LawReview, Vol. 38, (Fall 2003)*    21

## EXPLANATION OF ABBREVIATIONS

Trial Transcripts                          referred to as                    T.T.

Trial Transcript Volume I                          "                         T.T. I

Trial Transcript Page number and line numbers                               T.T.I-
page:line   --- Example Volume I, page 10, lines 2 through 5 would
Be                                                                          T.T.I-10:2-5
Decision of the hearing department                                          Dec.

Depositions                                                                 Dep.

Dep. Reference would also be similar to the Trial Transcripts

Volume I, page 10, lines 2 through 5 would be                               Dep. I-10:2-5

**TO THE HONORABLE RONALD M. GEORGE AND HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF CALIFORNIA**

Petitioner, , respectfully requests this Court to issue its writ to reverse or modify the decision of the State Bar Court hearing department. Petitioner requested the review department of the State Bar Court to adopt the hearing department's decision because of an extensive delay in the adjudication of the appeal which was filed immediately after the suspension of Petitioner's license by the hearing department judge on October 24, 2004. It has been over seventeen months since Petitioner was placed on an involuntary inactive enrollment and his license was suspended. Petitioner requested the review department to please lodge the final decision with the Supreme Court which the review department did on February 8, 2006.

I

Petitioner, PADAM KUMAR KHANNA, respectfully requests this honorable Court pursuant to the <u>California Business and Professions Code section 6081 through 6083 and Rule 952(a) and Rule 954 (a) (1) (2) (3) (4) (5)</u> to please review the Decision of the hearing department of the State Bar Court. Petitioner also requests this honorable Court to issue an Order for Stay of Execution of the State Bar Court suspension order that has been in effect since October 24, 2004.

II

Petitioner's license to practice law was suspended as of October 24, 2004 by an order of the hearing department judge of the State Bar Court after a three day trial held from August 17, 2004 to August 19, 2006. The hearing department judge, Honorable Pat McElroy, placed Petitioner on an involuntary inactive

i

enrollment by issuing an order on October 21, 2004, which became effective three days later, and it is still in effect over seventeen months later.

### III

Petitioner was charged with seven counts of professional misconduct arising out of a single money transfer incident with a single client, which occurred over nine years ago in November 1996. Count One was for violation of Rules of Professional Conduct, rule 3-300 (Business Transaction with a Client). Count Two was for violation of Business and Profession Code, section 6106 (Moral Turpitude). Count Three was for Failure to Release File, Rules of Professional Conduct, rule 3-700(D)(1). Count Four was for Failure to Render Accounts of Client Funds, Rules of Professional Conduct, rule 4-100(b)(3). Count Five was for 'Moral Turpitude-Misrepresentation/Misleading Statements to the State Bar Relating to the Disposition of the Client's Funds', Business and Professions Code, section 6106. Count Six was for 'Moral Turpitude-Misrepresentations/Misleading Statements to the State Bar Regarding the Client File', Rules of Professional Conduct, Section 6106 and Count Seven was for failure to Cooperate in State Bar investigation, Business and Professions Code, section 6068(i).

### IV

The judge found Petitioner culpable of all counts except Count Seven. This culpability was found despite a crucial one hour and forty minute audiotape of vital cross-examination of the principal witness that was completely indiscernible. This fact was known to the judge but no mention of this serious omission was made in her October 21,2004 decision.

### V

The judge's decision (Decision) is a complex and self-contradictory document. It is based upon facts that are no where in the record. It analyzes

twenty one (21) California Supreme Court and State Bar Court decisions that have no bearing whatsoever on the facts at hand.

VI

After receiving the Decision, Petitioner requested the audio CD of the proceedings. This CD, recorded on sophisticated digital recording equipment, was corrupted at a very crucial juncture of the proceedings. One hour and forty minutes of Petitioner's cross-examination of the principal witness, Jagjit Randhawa (Jagjit) appeared to be clearly erased or tampered with. This problem, perhaps a technical one, was not known to Petitioner and was not communicated by the hearing department judge. The recording equipment was under the exclusive control and in the possession of the hearing department judge. Petitioner was asked to pay the substantial sum of $3,000 to the State Bar to receive a transcription of the CD by a certified Court Reporting Agency. It took five months for the review department to get the CD transcribed. When the transcripts were received, it was confirmed that one hour and forty minutes of cross-examination of Jagjit was indeed indiscernible. The judge was fully aware of this fact.

VII

On receipt of the transcripts minus Jagjit's partial cross-examination, Petitioner filed a Motion for New Trial with the review department on the strength of *Weinstein v. E.F. Hutton & Co.* (1990) 220 Cal.App. 3d 364, 269 Cal.Rptr. 443). The holding in *Weinstein* was overturned and overruled by the review department. Disregarding the rulings in *Weinstein*, in the case at hand, the review department issued an order to conduct a very limited, restrictive, partial retrial by recalling the witness Jagjit and allowing Petitioner to cross-examine him. This partial retrial was an □utré Kafkaesque trial where neither the judge, nor the Deputy Trial Counsel (DTC) nor Petitioner knew what to do or what not to do. At

iii

this partial retrial, Petitioner's motion to have the proceedings recorded by a live court reporter was denied. Unfortunately some portions of this audio CD were also garbled and indiscernible. It was impossible to hear the translation of the questions in Punjabi language by the interpreter and the answers by Jagjit. Petitioner requested a clean and discernible disc. It was not provided. As of this day Petitioner has not received a discernible disc.

## VIII

The gravamen of the charges centers upon NDC's first count, which accuses Petitioner of soliciting $25,000 from a husband and wife, Jagjit Randhawa (Jagjit) and Baljit Randhawa (Baljit), (Randhawas), for investment in an Indian company, Amerindia Foods Limited (AFL). At the trial, Randhawas made disjointed, self-serving and false statements. DTC presented three documents written by the officers of AFL. The judge admitted this hearsay and unauthenticated letters, into evidence as <u>State Bar Exhibit 28, page 3</u> through 5, for the truth of the matter asserted therein. DTC *confirmed* the existence of AFL. The judge *accepted* these letters as the documents asserting the truth in their writings. However, in her decision she mysteriously labeled AFL as a 'sham' and 'non-existent' company. This is a very strange decision as later in the decision, the judge suddenly declared, without any proof whatsoever, these same three documents to be fabricated and manufactured by Petitioner himself and threw the entire case presented by DTC to the winds.

## IX

As the case was being dragged out and the review department was in no hurry to expedite it. (After one year of suspension, Petitioner made a motion to review department to expedite the proceedings and grant termination of suspension order till the case was decided by the review department. It was denied).

X

Under these circumstances, Petitioner waived his request for review from the review department and opted for his option for a direct review from the Supreme Court. On February 8, 2006, review department granted Petitioner's motion, adopted the decision of the hearing judge as the decision of the State Bar Court and submitted its final certificate, which was a prerequisite for Petitioner to file a Petition for Writ of Review with the High Court.

XI

Petitioner, hereby, very respectfully, petitions this Court to please review the facts of the case *de novo* and if the Court find that Petitioner *solicited* those funds from Randhawas in any way or form whatsoever, then Petitioner deserves disbarment and all the other interrelated charges are then moot.

**EXHAUSTION OF STATE BAR COURT REVIEW**

Petitioner was suspended from the practice of law by an order of the hearing department judge on October 21, 2004, which became effective three days later. After a timely appeal to the review department, it was discovered that one hour forty minutes recording of the main witness was either corrupt or erased. The review department ordered a partial new trial to recapture the missing testimony of the witness. Nothing could be achieved by that trial. Even partial recording of this retrial is corrupt. Because of this delay of over seventeen months, Petitioner opted to seek review directly from the Supreme Court and requested the review department to adopt the hearing department judge's decision and lodge the final decision with the Supreme Court. The review department granted the request and the said final order is attached herewith as Appendix 'A'.

**GROUNDS FOR REVIEW**

Petitioner, respectfully, seeks review of the State Bar Court (Hearing Department), filed with this Court on February 8, 2006. This Petition is brought

v

pursuant to Section 6081 through 6083 of the California Business and Professions
Code, as well as, Rules 952 and 954 of the California Rules of Court. Review is
sought on the grounds that:

1.   the recommendation is erroneous with respect to important
     questions of law (Rule 954 (a)(1));

2.   the State Bar Court has acted without or in excess of jurisdiction
     (Rule 954(a)(2));

3.   Petitioner did not receive a fair hearing (Rule 954(a)(3));

4.   the decision is not supported by the weight of evidence (Rule
     954(a)(4));

5.   the recommended discipline is not appropriate in light of the
     record as a whole. (Rule 954(a)(5)).

## WHY REVIEW IS APPROPRIATE

Petitioner states that the landmark Supreme Court cases, such as *Conway v.
State Bar* (1989) 47 Cal. 3d 1107, 255 Cal.Rptr.390, 767 P. 2d 657, *In re Attorney
Discipline System*, (1998) 19 Cal.4th at pp.592-593, 79 Cal.Rptr. 2d 836, 967 P. 2d
49. and *In re Rose* (2000) 22 Cal. 4th 430, 93 Cal. Rptr. 2d 298. et al do not clearly
define the doctrine of Separation of Power between the judiciary and the
legislature. There is a lot of confusion about the power and authority vested in the
hearing department judge of the State Bar Court who can suspend the license of
any attorney by placing him on an involuntary inactive enrollment by invoking
Business and Professions Code section 6007(c)(4) and rule 220(c) of the State Bar
Court Rules of Procedure. An important issue is before this Court whether this
Court has delegated its inherent authority to a single non Article VI, section 1
judge.

Another important issue that has been raised by this case deals with the digital recordings used in the State Bar Court. The total and exclusive control of this recording equipment under a single hearing department judge raises serious questions about the due process rights of the charged attorneys. Whether it happens or not, doubts can arise of the judge tampering with the evidence if the judge is biased and prejudicial against the attorney.

Another request is also being made to this Honorable Court to please review the matter of the Deputy Trial Counsel suppressing and destroying exculpatory evidence in this case. This Court simply does not tolerate any such act. It has been clearly emphasized by Honorable Justice Kennard in *Cedars-Sinai Medical Center v. Superior Court (Bowyer)* (1998) 18 Cal. 4th 1, 74 Cl. Rptr. 2d 294.that, *[t]he intentional destruction of evidence is a grave affront to the cause of justice and deserves our unqualified condemnation* 18 Cal. 4th at 4..

# INTRODUCTION

# AND

# STATEMENT OF CASE

This is a case of unparalleled proportions in the annals of the California attorney discipline system.  Under the legislative authority vested in the hearing department judge of the State Bar Court through Business and Professions Code section 6007(c)(4)[1] and augmented by rule 220(c)[2] of the Rules of Procedure of the State Bar Court, the judge of the hearing department (judge) can suspend the license of a charged attorney by placing him in an involuntary inactive enrollment, within *three* days of her decision.  This authority gives the judge the power to adjudicate any alleged conduct of an attorney as an act involving 'moral turpitude.'  The judge then is the sole and independent authority to decide whether the charged attorney would pose danger to the general public in the future and thus suspend his license.  The judge does not even have to provide any evidence, reason or logic whatsoever in support of her decision to brand the attorney as a 'dangerous person.'

---

[1]    Business and Professions Code section 60079c)(4) states:  "(4) the board shall order the involuntary inactive enrollment of an attorney upon the filing of a recommendation of disbarment after hearing or default.  For purposes of this section, that attorney shall be placed on involuntary inactive enrollment regardless of the Membership status of the attorney at the time."

[2] rule 220(c) of the Rules of Procedure of the State Bar of California states: "If the Court recommends disbarment, it shall also include in its decision an order that the respondent be enrolled as an inactive member pursuant to Business and Professions Code 6007, subdivision (c)(4). The order of inactive enrollment shall be effective upon personal service or three (3) days after service of mail, whichever is earlier, unless otherwise ordered by the Court."

The judge, who has no jury to worry about, can degrade, insult and categorize a fellow member of this prestigious California State Bar of committing a dastardly crime of tampering with and fabricating evidence and accusing Petitioner of somehow sneaking into the State Bar's offices, bypassing all the security and placing an envelop containing exculpatory evidence at the desk of the State Bar investigator. The judge knows there is no jury to challenge her findings. The judge knows she has no one to answer to. The judge knows she has full and absolute control over all proceedings during trial. The judge knows she does not have to worry on which side she throws her weight of judicial position. The statement made by the judge in her Decision, which is a public matter, is as follows:

> "Absent any evidence of tampering, the Court believes that
> Respondent somehow had the letter delivered to the State
> Bar and not necessarily from India." (Decision p. 11:1-2)

Even Honorable Justice Baxter would agree that such speculative remarks, indicating criminal activity, made off-handedly, without any evidence whatsoever to support them, are not petty matters and certainly should not be made by a judge of the State Bar Court. (See Baxter J. dissent in *People v. Sturm*, (March 6, 2006) (California Supreme Court No. SO31423)

Judge Pat McElroy's (Judge) conduct during this trial surpasses the conduct of the trial judge of the Sturm case. Unlike the Sturm case, the judge issued a scathing decision suspending Petitioner's license within three days of her decision and did not notify Petitioner that an extremely crucial and vital portion of the cross-examination of the principal witness was erased, tampered with or technically corrupted.

In the Sturm case, the Court found treatment of the defense counsel by the trial judge as unbecoming of a judge of the trial court. Here, the treatment of Petitioner not only is unbecoming, it borders on cruelty and inhumane treatment.

Petitioner had a heart arrhythmia incident during the trial. He wanted continuance for JUST ONE day, and it was 4:30 P.M. anyway. The judge's denial of continuance and insistence to keep the proceedings going for the next half hour were clearly prejudicial. (See Denial of Continuance, *infra.*)

It is well established that the Supreme Court has an 'inherent' and primary regulatory power in the matters of attorney discipline. See, *In re Attorney Discipline System*, (1998) 19 Cal.4th at pp.592-593, 79 Cal.Rptr. 2d 836, 967 P. 2d 49, See also *In re Rose*, (2000) 22 Cal.4th at pp.441-442, 93 Cal.Rptr. 2d 298, 993 P. 2d 956 and *Obrien v. Jones* (2000) 23 Cal. 4th 40 at 46, 999 P. 2d at 100. (Other citation omitted).

However, apparently the Supreme Court has *delegated* its powers to a single non Article VI, section 1 judge of the California Constitution[3]. In *Conway v. State Bar* (1989) 47 Cal. 3d 1107, 255 Cal.Rptr.390, 767 P. 2d 657, the Court stated, "It suffices to note that while petitioner may have a right to a hearing before he is prevented from practicing law, he has no right to a particular forum or particular procedures, <u>provided only that the matter is heard by an impartial arbiter under procedures that comport with due process.</u>" (Emphasis added) <u>47 Cal. 3d at 1120.</u>

Apparently this holding in *Conway*, was indirectly applied in *Rose, supra,* where the High Court affirmed the State Bar Court's 'recommendation' and summarily issued a judgment *without a hearing and a written opinion.* (Emphasis added).

Strengthened with such delegation of power from the Supreme Court and as a constitutional entity placed within the judicial article of the California Constitution and acknowledged as an administrative arm of and adjunct to the

---

[3] Article VI, section 1 provides: "The judicial power of this State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts. All except justice courts are courts of record."

Supreme Court (*In re Attorney Discipline, supra* at 19 Cal. 4th at 590-591), the State Bar Court promulgated rule 220(c) of the Rules of Procedure of the State Bar Court in 1997. This rule 220(c) gave an unequivocal and unconditional power to the single hearing department judge to place an attorney on an involuntary inactive enrollment if she alone concluded that the charged attorney's conduct involved moral turpitude and that he was a 'dangerous person.'

This unquestionable power, though termed as 'recommendation' and treated as 'temporary,' actually suspends the license of the charged attorney and this actual suspension from the practice of law can last for over sixteen months and indefinitely beyond till it is heard by the Supreme Court. The suspended attorney has no immediate remedy to seek review form the Supreme Court. As shall be discussed *infra*, Rule 952(a) of the Rules of Court does not trigger till the suspended attorney has obtained a 'final' certificate from the State Bar Court in reference to exhaustion of administrative remedies doctrine.

In the case at hand, despite a controversial single act, committed about ten years ago in 1996, of ***unsolicited*** money transfer by a single client to one of the attorney's dormant accounts for onward transmission to a company in India for investment purpose, the judge found Petitioner in violation of Rule 3-300 of the Rules of Professional Conduct and placed him on an involuntary inactive enrollment effective within ***three*** days of her decision.

This order of 'temporary' suspension was issued by the judge without any mention of the one hour forty minute corruption of audio recording of crucial and material admissions by the principal witness during cross-examination at the trial. The digital audio recording machine and the disc were in sole and exclusive control of the judge and it is presumed that she must have referred to the recorded proceedings before publishing her decision. This vital portion of the record of

4

proceedings, which was extremely valuable for Petitioner's defense, was found to be totally indiscernible.

The judge also found Petitioner culpable of a new and surprising charge of an additional $6,000, purportedly paid by the witness for investment purposes that was neither recorded by the State Bar in its Notice of Disciplinary Charges (NDC) nor communicated to Petitioner. The witness's complaint to the State Bar and further copious filings both by the witness's attorney, Mr. Bryant Byrnes (Mr. Byrnes) and the State Bar never mentioned this extra $6,000 till the day of deposition when Mr. Byrnes testified that he himself learned of this extra $6,000 only during deposition of his client. The Office of the Chief Trial Counsel was represented by Ms. Tammy Murray-Albertsen, Deputy Trial Counsel (DTC), who was present at the depositions. Regardless of this new charge DTC never amended its NDC.

The facts below shall show that the honorable judge has even gone to the length of accusing Petitioner of planting a phony letter at the desk of the State Bar investigator in Los Angeles, apparently bypassing all the security, log ins and the reception area, and sneaking into the investigator's office, placing the phony letter and then disappearing. (Dec. p.10:18-22, p. 11:1-2.) (See Dec. p.11:1-2 also discussion *infra Fair Hearings* p.?)

In actual reality this case involves a client and his wife who, in order to bring their relative to the United States from Punjab, India, followed an illegal scheme of investing in an Indian company with ties and connections to the United States and then obtaining a training visa for the relative, on behalf of the Indian company, as a shareholder. This scheme, unknown to Petitioner at that time, was prevalent in Punjab, India, where these clients hail from[4].

---

[4]   Petitioner Exhibit WW was not admitted by the judge due to Authentication.

5

Petitioner was charged in the NDC, filed on June 25, with seven counts of misconduct involving a single client and a single transaction that occurred ten years ago in 1996. The complaint was filed with the State Bar by the Randhawas on November 20, 2001. The principal charge was that of violating rule 3-300 of the Rules of Professional Conduct. The State Bar charged Petitioner with soliciting $25,000 from the Randhawas for investment in an Indian company, which funds, according to the allegations, Petitioner did not transfer to the company in India and instead used for his personal use.

Petitioner contended first that he never solicited the funds. Second, there were three deposits made by the Randhawas. One for $9,000 was for the partial payment of fees that were long overdue and two deposits, amounting to $16,000, in a dormant account Khanna Foods, USA, exclusively controlled by Petitioner. These two deposits were made by Randhawas for onward transmission to India for investment purposes to become a shareholder in an Indian company, AFL by Petitioner. AFL had leased a temporary space (a desk, access to telephone, fax, email and computer, etc.) from Petitioner at that point in time. Petitioner did in fact transmit $16,000 immediately within hours of the knowledge of the deposit.

This transfer was duly acknowledged by DTC at the trial as DTC introduced a letter from Director of Finance of AFL, State Bar Exhibit 28, page 3, which confirmed receipt of Indian Rupees Five Lakhs and Fifty Thousand (equal to $16,000 at the then rate of exchange). This letter was admitted, despite its hearsay and authentication issues, for the truth of the matter asserted therein, which was that $16,000 was received as an investment by AFL. (T.T. I-45:16-25, I-46:1-25, I-47:1-12)

## STATEMENT OF FACTS

Petitioner provided excellent legal services to the husband and wife team of Jagjit Singh Randhawa (Jagjit) and Baljit Randhawa (Baljit) in five different matters. There is no dispute about the quality of services provided. However, there is a dispute as to who Petitioner represented and the amount of fees paid.

The judge in her decision has misrepresented the facts about representation of parties. Why this has been done is not known.

On November 19, 2001, Randhawas filed a complaint with the State Bar, under the penalty of perjury under the laws of the State of California, stating that:

1. "Yes, Mr. Khanna was employed from January 1996 to March 1999. He was paid at least $2,100.00 in cash and checks." <u>State BarExhibit 9, page 1, para5</u>

However, during the trial in the hearing department of the State Bar Court held on August 17-19, 2004, where Honorable Judge Pat McElroy (judge) presided, Jagjit admitted that this was a false statement and that he did not tell his attorney that Mr. Khanna was paid $2,100 for fees in cash or checks. (T.T. I-174:16-20)

Petitioner represented Jagjit for the first time January-February, 1996, when he had an accident on a California freeway while taking his bride (recently arrived from India), from the Battered Womens Shelter in San Francisco, where she had taken refuge from her husband, to social security offices. Jagjit stated that he was legally drunk and, while having another fight with his wife, he collided with a truck. As he already had been charged with an earlier DUI a month before and had been represented by a public defender, he simply ran away from the scene

and left his wife to take the rap. He stated further that the police gave a vehicle code violation citation to his wife who had never driven a car in her life. In the complaint, Jagjit stated:

2. **"January to February 1996** – Mr. Khanna (Petitioner) defended Jagjit Randhawa against DUI charges, case 23152(A). There was no written retainer agreement that we recall and Mr. Khanna has not given us the files in spite of repeated requests." <u>Exhibit 9, page 3, para 1</u>

At the trial, however, Jagjit stated that this statement, though signed under the penalty of perjury, was false (T.T. I-176:22-24, I-177:1-3) and that it was not he who was driving but it was his wife. (T.T. I-177:16-25 also T.T. I-181:21-24). The DTC shifted the blame to Mr. Bryant Byrnes (Mr. Byrnes), attorney for Randhawas, for filing a false statement (T.T. I-174:5-11) apparently in the hope that Mr. Byrnes could get away due to California Code of Civil Procedure, section 47 Privilege. Mr. Byrnes testified that he did not know whether the above-mentioned statement was correct or false, and he desperately tried to justify his drafting of the document. He stated that he derived the information from Petitioner's written response to him and that he took the facts from Petitioner's letters. (T.T. II-29:12-25 and II-30:1-25). The judge in her Finding of Facts, however, found that Jagjit was correct and that it was Jagjit's wife, Baljit, whom Petitioner represented in that DUI, Vehicle Code violation matter. (Dec. p.3:5-6). How the judge arrived at such a conclusion is not known. As to the files, Jagjit also testified that he never asked Mr. Khanna for them. (T.T. I-177:4-15).

3. **"March to July 1996** – Mr. Khanna assisted Baljit Randhawa in getting a Temporary Restraining Order against Jagjit Randhawa.

A. So, on that case, he was not our attorney because *I met him after that case. I did not meet him before that.* (Emphasis added)

Q. Okay. By the time – when you did meet M. Khanna, did he provide any form of counseling to you and your husband to try to make things smoother between the two of you.

A. So, I told you, I don't know Mr. Khanna before that fight – husband and wife, so then the case was finished. *Then, I met Mr. Khanna.*" (Emphasis added)

(T.T. II-76:17-25, 77:1-2)

Despite all this testimony and the documents on record, the judge insisted that Petitioner did represent Baljit in her TRO matter. Again the reason is unknown.

4.    **"July to September 1996** – Mr. Khanna defended Baljit Randhawa against petty theft charges. Plea bargaining reduced to $100 fine. There was no written agreement that we recall and Mr. Khanna has not given us the files in spite of repeated requests." <u>Exhibit 9, page 3, para 4</u>

Petitioner did a tremendous job in getting Baljit off by having her plead guilty to a minor charge. Baljit was caught red-handed on video camera taking price tags and labels off the merchandise and stuffing it in her large bag at Ross Dress for Less store in Berkeley. Petitioner met with the security officer, manager and other personnel and diligently worked with the D.A. Petitioner spent over 37 hours on the case. Fee was set for $5,000, which the Randhawas had agreed to. As the financial situation of Randhawas was not good, Petitioner deferred the

payment for later date and was paid $500 by check. The judge, however, arbitrated the entire fee to be only $500, which amounts to an absurd $13.51 per hour. Strangely enough, the judge made an unusual statement in her decision. She wrote, "But Baljit did not plead guilty to shoplifting and was let off with a fine of $100." (Dec.p.3:21-22). Baljit was in actuality fined $100 *because she plead guilty.* The reason for the judge's statement is unknown.

Next, Petitioner represented Baljit in her retrieval of personal property that she had left with a neighbor while she moved away from the apartment she was sharing with her husband. However, the judge somehow concluded that Petitioner represented Jagjit and not Baljit.

It was Baljit who had left her husband because of cruelty and other charges and had moved some of her stuff from her residence to a friend's house when Jagjit was away for a day. She and her husband were living in a two bedroom apartment with another couple at that point in time. After reconciliation, Baljit asked Petitioner to recover her personal property from this friend who would not return it to her. She gave Respondent a handwritten detailed two page list, signed in her own handwriting, that listed the furniture and goods. This list is attached as State Bar Exhibit 1, insert 14. It was totally incredible and unbelievable. Here she had just recently arrived for the first time in the States from India. Within two months, without a job and her husband working as a gas station attendant, she appeared to have amassed great wealth and material goods. They could not pay legal fees. Petitioner was flabbergasted, but he did file the complaint in Contra Costa County on her behalf. The Case Number is 039235. The matter was very well defended by defendants' lawyer. Defendants propounded substantial interrogatories and were going to file a cross-complaint. At that point in time, Baljit requested Petitioner to drop the case, and Petitioner did.

Again, the judge made a deliberate misrepresentation of this fact. She ruled that Petitioner represented Jagjit and not Baljit in this property retrieval case. (Dec. p.4:5-7). The judge knew who Jagjit (male) was and who Baljit (female) was, and the judge's designation of "his" and "her" clearly demonstrates that knew which was which. Why she substituted Jagjit for Baljit is unknown.

Jagjit visited Petitioner in his offices in July, 1996. During the visit, he saw some material about an Indian company on a separate desk next to the receptionist area. Petitioner did not have a secretary at that time and that space next to the receptionist area was temporarily leased to an Indian company, AFL. AFL was contemplating buying food processing machinery from Italy for shipment to India. As Petitioner was AFL's legal counsel in the U.S. and had an equity interest of approximately 4% in the Indian company, he was retained by AFL to negotiate the purchase at that time.[5] Petitioner remembers talking to Jagjit about AFL and its operations in India. Jagjit showed sufficient knowledge of farming when Petitioner told Jagjit that he and his family in India were working on development of hybrid organic tomato seeds.

On or about, September 15, 1996, a Sunday, both Jagjit and Baljit urgently met with Petitioner and expressed a desperate need for the assistance of a lawyer in India as Baljit's brother needed to leave India and come to the U.S.

Petitioner referred the Randhawas to his brother in India who was an Advocate of the Indian Supreme Court. Petitioner gave all the instructions and set up the appointment for Baljit's brother to meet with Mr. Chiter Khanna the next day, September 17, 1996. Unbeknownst to Petitioner, at that point in time, in desperate moves to obtain U.S. visa, Indian people, particularly in Punjab, were

---

[5] Even though AFL was an Indian company, Petitioner did have a disclosure form duly signed by ALL the directors of AFL which satisfied all the five criteria of Rule 3-300 as Petitioner was an equity holder and the legal counsel of the company.

12

associating with Indian companies who had ties with a business entity in the U.S. They would pay anywhere from $30,000 to $50,000 to get some type of equity interest and then apply for a visa for training in the U.S. with the American entity. Petitioner's Exhibit W showing a newspaper article about this fraudulent scheme was not admitted into evidence by the judge.

During the trial, both Jagjit and Baljit denied that they sought Petitioner's help. Their answers on this subject are in the deposition. <u>State Bar Exhibit 2, p.34:2-23</u>

The contents of Petitioner's Exhibit DD are self explanatory.

During the re-cross examination of Jagjit at the partial retrial, Jagjit gave absolutely contradictory testimony to his entire stand that they never sought help from Petitioner regarding their relative's immigration issues (T.T.- II-2:25, 3:1-17).

In October, 1996, Jagjit had another serious DUI. In that case his blood level was way over the legal limits. He had hit another car. He injured the driver, damaged the other car, ran away from the accident, and hid in bushes where the police found him, and he was arrested. Petitioner diligently and expertly defended his DUI. Jagjit, his wife and his father, owner of the car, were sued for considerable damages by the injured plaintiff. This hit and run lasted for over seven months when Petitioner was able to negotiate a settlement deal with the plaintiff's attorney for only $4,000 wherein Jagjit was to pay only $100 per month for the next three years because of his financial position.

On or about November, 18, 1996, Jagjit called Petitioner and informed him that he had deposited $9,000 in Petitioner's personal account for partial payment of overdue fees and $9,000 in the account of Khanna Foods, U.S.A. for onward transmission to AFL in India. Petitioner was extremely surprised. When Jagjit informed Petitioner in the same telephone conversation that he was going to

deposit another $16,000 the next day, Petitioner told him not to do so. <u>State Bar</u> <u>Exhibit 28, page 2</u>  Petitioner believes that the sudden infusion of funds materialized from India, though Petitioner has no proof.  However, Petitioner believes that, were there a new trial, this issue would be resolved in petitioner's favor depending on the outcome of the lawsuit AFL has already launched against Randhawa's brother in India and the Randhawas.

Surprisingly at the trial, Jagjit took a different position.  He stated that he did not receive this letter. During the cross-examination and in deposition, he did not remember whether he lived at the address given in the letter. It was in the files which were given to his attorney. The judge, however, agreed with Jagjit and concluded that Jagjit did not receive this letter, State Bar Exhibit 28, page two.

DTC, in support of her case that Petitioner solicited investment, introduced into evidence three letters, Exhibit 28 pp.3,4,and 6.  These letters were written by the officers of AFL and were mailed from India to Jagjit Randhawa in the United States.  All this took place in 1996-97.

## PART ONE
## LEGAL ARGUMENTS AND ANALYSIS

### I.  COUNT ONE: *Avoiding Interests Adverse to a Client (Rules Prof. Conduct, Rule 3-300*

Petitioner, respectfully, states that he fully, clearly and entirely understands and agrees with the provisions of Rule3-300.  Here, however, the situation is quite different.  Randhawas were NEVER solicited for investment in AFL  Client's interests come first and foremost.  Petitioner has fully maintained that  The offer, even if Petitioner could have made, would have required extreme complications and myriad of Indian and U.S. security laws.  Furthermore, there should be an other addendum to the Rule 3-300.  When there are clients who do not understand

14

English properly, they should also be provided copies of translation in their native language.

In order to charge Petitioner for this serious charge, it is fundamentally required that DTC prove this charge with a clear and convincing evidence. Petitioner would gladly concede to all these charges if this Court concludes that Petitioner solicited the investment even with preponderance of evidence or any evidence at all except Randhawas testimony which is fraught with inconsistencies.

## A. Burden of Proof As to Solicitation::

The Burden of Proof of the charge that Petitioner solicited $25,000 from the Randhawas for investment in an Indian company AFL controlled by Petitioner is on the DTC.

This burden was not met. DTC failed to prove that Petitioner "frequently discussed with Jagjit about AFL, its lucrative potentials (there was no evidence presented) and the window period that the Randhawas could partake in the business venture. (There is no record about window period) (Dec. p.5:5-7).

The Decision states and puts great emphasis upon AFL's investment "brochure" which showed profitability, and called for a "deadline." (Dec. p. 5:9). Where is this "brochure?"

During trial, Jagjit denied having seen any prospectus or binder which sought investment. The interesting part is that the judge, HERSELF, interrupted for clarification and confirmed it. (T.T. I-194:10-25, I-195:1-12)

## B. Burden of Proof As to three Deposit Slips:

DTC charges that Petitioner gave three deposit slips to Randhawas. One for personal bank account and two for Khanna Food account. (NDC, Count One, p.3:7-11.)

DTC has alleged and the judge has acquiesced that there were three deposit slips which were given to Randhawas by Petitioner. Burden of producing those three deposit slips was on DTC. It *did not shift* to Petitioner. DTC has failed to produce the third deposit slip. The third deposit slip is an extremely crucial and vital document which goes to the heart of credibility of both witness and Petitioner. The question is whether DTC has intentionally and deliberately withheld, suppressed or destroyed the third deposit slip as it has been proven beyond any reasonable doubt that DTC had in her possession three deposit slips. It is also very strange that the honorable judge also does not mention or make any statement about non-production of this vital piece of evidence. A lot of time has been spent in the trial on payment of fees by the witnesses . As the witnesses changed their story about payment of fees, DTC and the judge labeled this deposit towards investment by suppressing the crucial evidence. This act itself should be sufficient to overturn the conviction.

In *Sargent Fletcher, Inc. v. Able Corporation* (2003) 110 Cal. App. 4th 1658, the Court stated"

> "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) [3] To prevail, the party bearing the burden of proof on the issue must present evidence sufficient to establish in the mind of the trier of fact or the court a requisite degree of belief (commonly proof by a preponderance of the evidence). (Evid. Code, §§ 115, 520.) The burden of proof *does not shift* during trial--it remains with the party who originally bears it. (Evid. Code, § 500; *Mathis v. Morrissey* (1992) <u>11 Cal.App.4th 332</u>, 346; *Smith v. Santa Rosa Police Dept.* (2002) <u>97 Cal.App.4th 546</u>, 569; 2 McCormick, Evidence, *supra*, Burden of Proof, § 336, pp. 409-410.)" <u>110 Cal. App. 4th at 1667.</u>

### C. State Bar Exhibit 28, p.4:- Letter from Financial Controller, AFL-India, Dated January 31, 1997.

DTC, in support of her case that Petitioner solicited investment, introduced into evidence three letters, Exhibit 28 pp.3, 4, and 6. These letters were written by the officers of AFL and were mailed from India to Jagjit Randhawa in the United States. All this took place in 1996-97.

This letter, Exhibit 28, P-4, was introduced by DTC to assert that AFL received an investment of Ten Lakhs of Indian Rupees. The letter became the focal point and the crux of the entire charges of DTC. A new charge of Ten Lakhs of Indian Rupees was interjected into the trial. Ten Lakhs of Indian Rupees amounted to $31,000 at that point in time i.e. around November 1996 at the prevalent rate of exchange between a U.S. dollar and Indian Rupee. A reference to a Lakh of Rupees means a denomination of 100,000. No amendment, however, was filed by DTC to its original NDC. The entire trial centered on this amount - 'Ten Lakhs of Indian Rupees.'

This letter, like the rest of the letters introduced by DTC into evidence, was clearly hearsay and violated rules of authentication. However, because Petitioner did not raise any objection, this letter was admitted. In *Jacobson v. Gourley* (2000) 83 Cal. App. 4th 1331, 100 Cal. Rptr.2d 349, the court stated:

> "Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law" ( *id.* , § 1400), such as by a statutory presumption (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1999) **Authentication** and Proof of Writings, § 30.11, p. 628; 2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, § 7, p. 139).
>
> The statutory presumptions (Evid. Code, §§ 1451-1454) affect the burden of producing evidence ( *id.* , § 1450). If the facts support the existence of a presumption, "[t]he burden is on the adverse party to introduce evidence

sufficient to sustain a finding that the ... official writing is not genuine in order to dispel the presumption of authenticity or genuineness." (1 Jefferson, Cal. Evidence Benchbook, 83 Cal.App.4th 1334.

A very strange development occurred because of this letter. Without amending the complaint and filing new charges, DTC took the position that Randhawas gave another $6,000 to Petitioner who sent that money to AFL, India and the Indian company acknowledged receipt of $31,000. It is very apparent from the entire proceedings that the idea of adding another $6,000 came from DTC and Randhawas were glad to oblige. They were probably instructed to just say that they gave another $6,000 to Petitioner IN CASH and had forgotten to mention in their complaint. However, a number of goofs were made both by the Randhawas and the DTC who could not remember whether Ten Lakhs came to $31,000 or $30,000. So everyone fumbled. First, it became $5,000 cash which Jagjit gave to Petitioner (T.T.I-143: 17-25, I-144: 13-21) and the judge herself ATTESTED to that figure. (T.T I-149:22-25, I-150:1-4) (T.T. I-186:16-19) (T.T. III: 69:9-13) Sometime it became $5,000 to $$6,000 (T.T. II-85:12-18), and the judge attested to that figure too (T.T. II-85:12-18) and sometime it became $6,000 and the judge attested to that too. (Dec. p.1:1-2)

The question neither the judge nor DTC answer is if they are asserting that AFL received $30,000 or $31,000 then why is Petitioner being blamed for misappropriating $31,000. If AFL did not exist, then why show that AFL received Ten Lakhs of Rupees? It is very confusing. No jury in the world would believe such contradictory, incoherent and ever-changing statement. No jury or unbiased trier of fact would ever believe that Randhawas gave another $5,000 or $5,000 to $6,000 or $6,000 to Petitioner for investment and then CLEANLY forgot about that for nine years till the trials. This Court is sincerely requested to rule whether Petitioner's Motion for a New Trial before an IMPARTIAL judge or any other judge except Honorable Pat McElroy was a denial of due process or not. .

The judge is desperately trying to establish that AFL does not and did not exist. She cannot do that because she has to depend upon AFL's letters to discredit Petitioner's credibility. To do that she has to point out what AFL said, what its officers meant and how much money AFL received and why AFL did not issue stock certificate to Randhawas. She is also in a dilemma as to how to justify that the letters from AFL were instead fabricated by Petitioner and were not sent by AFL in India. If she does that then she cannot agree with DTC that AFL did receive the funds for investment purposes and that the funds amounted to $30,000. She does make very feeble attempts by saying that "Finally, Petitioner is supposedly the legal counsel for AFL, yet he could not produce any certified copies of AFL's articles of incorporation. In fact, he could not produce any certified copies of documents proving AFL's legal existence." (Dec. p. 11:11-14) Both DTC and the judge are fully aware of the fact that true and correct copies of certificates of incorporation and certificate for commencement of business were attached as long back as August 2, 2003. See PETITIONER'S RESPONSE TO NOTICE OF DISCIPLINARY CHARGES, PAGE 2:11-12 which states, "True and Correct copies of AFL's certificate of incorporation and certificate for commencement of business are attaches as **Exhibits 1 and 2**. (State Bar Exhibit 7, p.2:12-13)

### D. Burden of Proof: Re: AFL's Existence:

The question here centers on the burden of producing evidence. Who has the burden of proving the status of AFL.as to whether it was a non-existent and a sham corporation or a legitimate business?

DTC has stated in her NDC as to Count One, that "Prior to November 1996 and continuing until 1999, Petitioner was a principal in the business, which was called Amerindia Food Limited (hereinafter "AFL"). The purpose of the

enterprise was to operate a food processing plant in India." (Notice of Disciplinary Charges (NDC).p.2:24-26)

Petitioner respectfully contends that it was and is DTC who has the burden to produce evidence according to Evid. Code section 500 to show 1) the existence of AFL, 2) that Petitioner was principal of AFL and 3) the purpose of AFL was to operate a food processing plant. The purpose of operation might not be a material issue but the existence of AFL is paramount. If the judge is stating that AFL is a non-existence and a sham corporation, then the charge of DTC fails right there. Petitioner, respectfully and very strongly, requests this Court to please decide as to who has the burden of proof as to AFL's existence

Assuming for the sake of arguments, we *shift* the burden of producing evidence to Petitioner (Evid.Code § 550) to prove that AFL was a legitimate corporation, the question is whether Petitioner has satisfied that burden. Petitioner has submitted certified Certificate of incorporation and Certificate of Commencement of Business of AFL in India not during trial but way back in his first Answers to the NDC.

### E. Burden of Proof: Re: Letters from AFL:

Besides the testimony of Randhawas, who denied ever receiving those letters by mail even though they were properly addressed and properly mailed, DTC could not introduce any evidence, such as envelopes bearing U.S. stamps, if mailed from the U.S. Instead a convenient stand was taken that Petitioner HAND DELIVERED these letters to Randhawas. Again this theory was substantiated by Randhawas' testimony only. There was no external evidence presented.

Petitioner tried to prove that the Randhwas lived at the addresses on the letters at the time the letters were mailed, even though Randhawas made desperate effort to side step the issue of the address but failed miserably. (see Dep. Vol. I-

p.14-21-24) (Dep. Vol. II, p 93-15-25) (Dep. II, p. 114:21-23) (Dep. Vol. II-p. 132::19-25, 133:1-5)

California Evidence Code Section 641 states that a letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail.

Professor Mendez in his article, *Presumptions and Burden of Proof: Conforming the California Evidence Code to the Federal Rules of Evidence, U.S.F.LawReview*, Vol. 38, (Fall 2003), states:

> " Assuming that the defendant's assertion that no contract existed is based on not receiving the plaintiff's written acceptance. In his case-in-chief, the plaintiff produces evidence that he prepared a written acceptance of the defendant's offer and asked his secretary to mail it to the defendant at the address on defendant's written offer. The plaintiff's secretary testifies that he copied the defendants' name and address from the offer, and after affixing the correct postage, dropped the acceptance in the mailbox outside the office. Assume that the law of contracts provides that an offer is not accepted unless the acceptance is received by the offeror. At the conclusion of the plaintiff's case-in-chief, should the judge grant the defendant's motion for a directed verdict on the ground that the plaintiff failed to produce any evidence that the defendant received the acceptance?

> The judge should deny the defendant's motion. In applying the sufficiency standard, the judge must view the evidence in the light most favorable to the party against whom the motion is directed." Id at 144 citing *Campbell v. General Motors Corp.* 649 P.2d 224,227 (Cal.1982)

## F. STATE BAR EXHIBIT 28, P. 3. LETTER FROM DIRECTOR OF FINANCE, AFL DATED DECEMBER 21, 1996.

During trial DTC tried to impeach Petitioner's testimony by introducing this exhibit on two fronts: First, when Petitioner testified that AFL had NEVER sought for or issued any 'brochure' for investment, DTC tried to prove that AFL did in fact seek investment from public as the letter stated, "Today we have received an amount of Five Lakhs and Fifty Two Thousand Rupees ($16,000)

enterprise was to operate a food processing plant in India." (Notice of Disciplinary Charges (NDC).p.2:24-26)

Petitioner respectfully contends that it was and is DTC who has the burden to produce evidence according to Evid. Code section 500 to show 1) the existence of AFL, 2) that Petitioner was principal of AFL and 3) the purpose of AFL was to operate a food processing plant. The purpose of operation might not be a material issue but the existence of AFL is paramount. If the judge is stating that AFL is a non-existence and a sham corporation, then the charge of DTC fails right there. Petitioner, respectfully and very strongly, requests this Court to please decide as to who has the burden of proof as to AFL's existence

Assuming for the sake of arguments, we *shift* the burden of producing evidence to Petitioner (Evid.Code § 550) to prove that AFL was a legitimate corporation, the question is whether Petitioner has satisfied that burden. Petitioner has submitted certified Certificate of incorporation and Certificate of Commencement of Business of AFL in India not during trial but way back in his first Answers to the NDC.

### E.  Burden of Proof:  Re: Letters from AFL:

Besides the testimony of Randhawas, who denied ever receiving those letters by mail even though they were properly addressed and properly mailed, DTC could not introduce any evidence, such as envelopes bearing U.S. stamps, if mailed from the U.S. Instead a convenient stand was taken that Petitioner HAND DELIVERED these letters to Randhawas. Again this theory was substantiated by Randhawas' testimony only. There was no external evidence presented.

Petitioner tried to prove that the Randhwas lived at the addresses on the letters at the time the letters were mailed, even though Randhawas made desperate effort to side step the issue of the address but failed miserably. (see Dep. Vol. I-

20

p.14-21-24) (Dep. Vol. II, p 93-15-25) (Dep. II, p. 114:21-23) (Dep. Vol. II-p. 132::19-25, 133:1-5)

California Evidence Code Section 641 states that a letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail.

Professor Mendez in his article, *Presumptions and Burden of Proof: Conforming the California Evidence Code to the Federal Rules of Evidence,* U.S.F.LawReview, Vol. 38, (Fall 2003), states:

> " Assuming that the defendant's assertion that no contract existed is based on not receiving the plaintiff's written acceptance. In his case-in-chief, the plaintiff produces evidence that he prepared a written acceptance of the defendant's offer and asked his secretary to mail it to the defendant at the address on defendant's written offer. The plaintiff's secretary testifies that he copied the defendants' name and address from the offer, and after affixing the correct postage, dropped the acceptance in the mailbox outside the office. Assume that the law of contracts provides that an offer is not accepted unless the acceptance is received by the offeror. At the conclusion of the plaintiff's case-in-chief, should the judge grant the defendant's motion for a directed verdict on the ground that the plaintiff failed to produce any evidence that the defendant received the acceptance?

> The judge should deny the defendant's motion. In applying the sufficiency standard, the judge must view the evidence in the light most favorable to the party against whom the motion is directed." Id at 144 citing *Campbell v. General Motors Corp.* 649 P.2d 224,227 (Cal.1982)

### F. STATE BAR EXHIBIT 28, P. 3. LETTER FROM DIRECTOR OF FINANCE, AFL DATED DECEMBER 21, 1996.

During trial DTC tried to impeach Petitioner's testimony by introducing this exhibit on two fronts: First, when Petitioner testified that AFL had NEVER sought for or issued any 'brochure' for investment, DTC tried to prove that AFL did in fact seek investment from public as the letter stated, "Today we have received an amount of Five Lakhs and Fifty Two Thousand Rupees ($16,000)

towards your investment in our company through Mr. Padam Khanna, our lawyer in the USA." (T.T.I-45:23-25, I-46:1-25, I-47;1-13) ?

Does this language suggest in any form or manner that AFL was out looking for investment?

Second, when Petitioner testified that it was only after the $16,000 (equivalent Indian Rupees 552,000) were deposited with AFL, that Petitioner touched the $16,000 deposited by Randhawas in Khanna Foods account in the U.S.A., DTC reintroduced this same letter to prove that AFL had in fact received the funds on December 21, 1996 and not on November 24, 1996 as the letter was dated 21 December, 1996 and stated, "Today we received....." (T.T. I-99:1-25).

This letter was clearly hearsay. It did not fall under any hearsay rule exception. Moreover, it lacked authentication. No foundation was laid. Yet it was introduced for the truth of the matter asserted therein *albeit*, Petitioner was wrong when he stated that AFL received the funds on November 24, 1996 and that AFL sought outside investment for their business. However, because Petitioner did not object to its introduction, the letter was admitted in to evidence.

The most amazing part of the entire trial is judge's lopsided and incoherent conclusions. As it can be seen, this letter was admitted to show that an investment was made though according to the letter, on December 21, 1996 and duly received by AFL. The judge acknowledges it as a proof against Petitioner's credibility. But then very surprisingly the judge refuses Petitioner to use the letter in his cross-examination because DTC makes an objection of hearsay. Can the judge make such ruling and can DTC object to the letter as hearsay which she admitted into evidence herself? The most bizarre element of this letter is that he judge later ruled it as fabricated by Petitioner and not necessarily from AFL or from India.

Incidentally no proof whatsoever, has been introduced that these letter did not come from India. No U.S. postage stamp envelopes were introduced. A very

22

convenient stand was taken by Jagjit that Petitioner hand delivered these letters to Jagjit and that he never received any letter from AFL.

If such is the case and the judge has accepted it then the entire case falls flat. If the letter is fabricated, then why accept it as the evidence proving the matter asserted therein? If ALL three letters from AFL were fabricated by Petitioner then why does the judge makes the following statements:

1.        "AFL sent three letters to Jagjit, confirming the receipt of his investment funds and promising the imminent issuance of stock certificate worth 20 lakhs shares" (Dec. p. 6:4-6)

2.        "He (Petitioner) told the State Bar that he would advise AFL not to allow the Randhawas to invest and to return the money. But AFL supposedly acknowledged receipt of the funds, thanked the clients, and assured them the stock certificates were forthcoming." (Dec. p. 16:5-7)

3.        "Chiter Khanna's letter contradicted the other alleged letters from AFL. He wrote that AFL would immediately refund the money to the Randhawas as unsolicited funds for investment. In fact, he stated that "we have made every possible effort from 1997 to 1999 to refund the funds to Mr. Randhawa.' While he indicated that the investment was prohibited and that its financial department made an error regarding the issuance of stock, there is no evidence of the alleged October 18, 1997 follow-up letter correcting its error. He further claimed that AFL ceased operation in 1999 and was in process of liquidation, some five years later. In sum the letter conveniently supported Petitioner's arguments without any credible evidence." (Dec. p. 11:3-10) [What the judge is trying to prove with this statement is very confusing. Is she admitting this hearsay, unauthenticated letter from Mr. Chiter Khanna from India into evidence as asserting the truth stated therein? Is she challenging Mr. Chiter Khanna's statement that even though he made a statement that AFL made efforts to refund the money, the Randhawas have

23

not received the funds and so she is impeaching Mr. Chiter Khanna's statement? Is she asserting that because there was no follow-up to the letter, it was not credible evidence? What actually is the judge conveying through these statements is unclear.]

4.          "Petitioner maintains that the current status of AFL is good in 2004 even though AFL's chairman stated that they were in the process of liquidation." (Dec. p. 11:15-17) [It is not clear from this statement whether the judge is attacking the credibility of Petitioner with the Chairman's statement in the letter or is she asserting that the status of AFL is not good.]

These and various other statements in the entire decision do not make any sense and contradict judge's own findings and reasoning.

## II. COUNT TWO: *Misappropriation (Bus. & Prof. Code, § 6106)*:

In her Decision, the judge concluded that Petitioner misappropriated $31,000 investment funds of Randhawas for his personal use. Misappropriation is a serious offense. To libel an attorney with such demeaning and degrading charges, it is fundamentally required that the charges must be proven with at least preponderance of evidence if not by clear and convincing evidence. On page 12:21-25 and page 13:1-16, OF THE decision, she reiterates what Petitioner's contentions are and then she remarks as follows: "He further tells a convoluted story of how his mother gave another $16,000 to AFL, so that the $16,000 remaining in the Khanna Foods account could be his personal money. As discussed earlier, the Court finds Petitioner's story unbelievable and rejects each of his fabrications.

Here is one clear example of what the Court in *People v. Perkins* (2003) 109 Cal. App. 4th 1562, 1 Cal. Rptr. 3d 271, said which applies in this case:

> "A trial judge may examine witnesses to elicit or clarify testimony [but he or she] must not become an advocate for either party or under the gui[s]e of examining witnesses [,] comment on the evidence or cast

aspersions or ridicule on a witness." (People v. Rigney (1961) 55 Cal. 2d 236, 241 [10 Cal. Rptr. 625, 359 P. 2d 23, 98 A.L.R. 2d 186].) <u>109 Cal. App. 4th at 1567</u>

During the trial, an exactly similar incident occurred. Jagjit testified under direct examination by DTC as to where he got the $5,000 that he allegedly gave Petitioner. Jagjit replied that,"I borrowed from my father" (T.T.I-152: 2-3). There was no interruption or clarification from the judge. She did not ask or question Jagjit as to where did his father get the five thousand from. Petitioner also did not question Jagjit about this matter. Had Petitioner questioned Jagjit as to where did his father get $5,000 from, it would have been improper to attack his father and moreover that question had to be answered by his father. In the Petitioner's case, however, the judge definitely did not pay any attention to the indirect innuendo attacking the dignity of Petitioner's mother when she questioned Petitioner as to where did his mother get the $16,000 from. (Incidentally, she degraded and attacked Petitioner's credibility by concluding in her Decision that, " *In particular*, (Emphasis added) Respondent was at a loss to explain where his mother obtained the $16,000 to give to AFL in India.' (Dec. p. 9:18-19). (As the entire reasoning of judge would show this is probably the ONLY "absolutely unbelievable and unreasonable contention and fabricated story,": the judge could pin Petitioner on.)

In *People v. Sturm*, (March 6, 2006), No. S031423, the *Sturm* case also, the Supreme Court ruled that,

> "However, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant." (People v. Mahoney, supra, 201 Cal. At p. 627.) <u>No. S031423, date March 6, 2006.</u>

### III. COUNT THREE: *Failure to Return Client Files (Rules of Prof. Conduct, Rule 3-700(D)(1)*

It is abundantly apparent from the entire proceedings and from Mr. Byrnes testimony himself that Petitioner NEVER refused to return six year old files of the

clients. Petitioner is very reluctant to point out that the judge has very clearly twisted the facts on this issue.

Respondent was NOT "in a fog" as to what to do with the files. Petitioner knew exactly what to do with the files. He had retracted all the files from storage as they were over six years old and had arranged them chronologically, labeled and tagged at his offices on or about October 15, 2001. First, Mr. Byrnes never contacted Petitioner after that date and second, Mr. Byrnes never sent an affidavit duly signed by his clients that they have requested the files. The judge ruled that the affidavit was not necessary. The judge also emphasized that it was some ten months after the request, Respondent wrote to the State Bar and attorney Byrnes on April 25, 2002 that he was going to send the files. (Dec. p. 14:10-16). Petitioner reasserts his statement which made to the State Bar and which has been labeled as a misleading statement that it was the first time that Petitioner was asked to send the files to Mr. Byrnes. The files were promptly dispatched within hours of the request from the State Bar investigator. (See, *Count five, Mr. Byrnes' statements during trial, infra.*)

### IV. COUNT FOUR: *Failure to Render Accounts (Rule 4-100(B)(3)*

Petitioner respectfully states that this charge is neither applicable to the proceedings at hand nor is supported by the evidence presented. There was no trust account involved. Sixteen thousand dollars were deposited in one of the dormant accounts of Petitioner for onward transmission to AFL in India. Petitioner never solicited this $16,000. As to the fees, Petitioner has given a detailed account of fees incurred to Randhawas' attorney, Mr. Byrnes that contained hours spent on each and every case and the hourly rate or a flat fee rate. Apart from the hourly rate sheets and the time spent on each case, Petitioner also provided a breakdown in his letter dated July 13, 2001.State Bar Exhibit 7, page 30. The judge has disregarded this summary breakdown and has accused

26

Petitioner of demanding receipts of money Randhawas sent to India. Petitioner requests this Court to balance the arguments presented by both sides and decide who is right given ALL the evidence in these proceedings.

### V. COUNT FIVE: *Misrepresentation to the State Bar regarding Client Funds (Bus. & Prof. Code, § 6106)*

The judge ruled that Petitioner made the following three statements that were false and misleading:

**One**: Respondent stated that he "only had......such as computers and parking citation." (Dec. p.15: 18-23). This is not a misrepresentation. It is the truth. The fact that Petitioner used the funds of $16,000 in Khanna Foods account for personal expenses is AFTER these $16,000 were already received and acknowledged by AFL in India. DTC confirmed the receipt (T.T.  ) and the judge acknowledged it

**Two**: "Respondent also...Randhawas to invest and to return the money." (Dec. p. 15:24-26, p.16: 1-6). Petitioner strongly asserts that this statement is true and correct and is tendered here under the penalty of perjury. Judge's conclusion that it was false by citing AFL's acknowledgement is contradictory, legally inapplicable. (If AFL is a non-existent company, then it is not correct for the judge to refute Petitioner's statement with what AFL said.)

**Three**: "Finally, he assert ...and the $9,000 as payment for legal fees." (Dec. p. 16:8-10). Petitioner again strongly asserts that this statement is also true and correct. Petitioner did not feign as to how upset he was. He was indeed upset and he did let the Randhawas know about it. State Bar Exhibit 28, p.2

Here is an example of how the power and authority delegated by the Supreme Court to a single judge in attorney discipline matters can really harm California attorneys. She has the sole and unequivocal authority to pronounce

such conduct as an act involving 'moral turpitude' and place the attorney on an inactive enrollment.

## VI. COUNT SIX: *Misrepresentations to the State Bar Regarding Client Files (Bus. & Prof. Code, § 6106).*

Again this charge is NOT supported by evidence presented at the trial.

January 2002 letter to State Bar. State Bar Exhibit 11. Petitioner's claim to the State Bar that it was the "first time" he had heard the clients demanded their files has been purposefully taken out of context. Petitioner did state that it was the "first time" he had heard *from the State Bar* that the clients demanded their files. Judges' statement that "In fact, attorney Byrnes has been requesting them since July 2001 is again misapplied. Attorney Byrnes had been requesting them but NOT asking, calling or writing to **SEND** them to him.

What is unfair to Petitioner is the fact that the following statements were made both by attorney Byrnes and the clients DURING TRIAL AND IN HER PRESENCE:

Direct by DTC:...(To Mr. Byrnes).....

Q.      When you asked for the opportunity to see the files, what did you mean by that?

A.      Well, I wanted either the chance to swing by his place of work, which is reasonably close, and examine them on site, or if he wanted to transmit them. I mean, it was basically his call, but I needed the opportunity to see what they were.

Q.      Okay. So at that point, you hadn't made a distinction between actually receiving them yourself or at least coming to look at them.

A.      No, but the point was, I wanted to see the files, and I would accommodate him whichever way he chose.

(T.T. II-9: 21-25, 10:1-7)

Again:

Q.      Okay. Now, second paragraph of that letter where you say, "I, of course, still require the case files and request from you a specific time they will be on hand."

A.      Correct.

Q.      Precisely what do you mean by that?

A.      Well, again, it was a matter of choice. I was going to accommodate him in that if he made contact and said there are a lot of files, would you come by and see them, that would be fine. If he wanted to mail them, that would be fine. But I needed to meet with the client. Wanted the files.

(T.T. II-11: 16-25, 12:1)

Jagjit Randhawa's testimony was also conducted before her:

Cross-examination of Jagjit by Mr. Khanna:

Q.    And then, you did not - - it says, "and we would call and Mr. "- - there was - - okay. "And we would call and Mr. Khanna has not given us the files in spite of repeated requests." You did not ask for the files, is that correct?

A.    No, I never asked him.

(T.T. I –177:4-8)

Petitioner, respectfully, requests this Honorable Court's ruling on these two counts of misconduct involving moral turpitude.

## VII. PROSECUTORIAL MISCONDUCT

## A. SPOLIATION OF EXCULPATORY EVIDENCE:

29

*The intentional destruction of evidence is a grave affront to the*
*cause of justice and deserves our unqualified condemnation.*

Justice Kennard in *Cedars-Sinai Medical Center v. Superior Court*
*(Bowyer)* (1998) 18 Cal.4[th] 1, 4, 74 Cal. Rptr. 2d 294; 954 P.2d 511

**1.    DHL Cover Letter:**

During the trial, while Ms. Alice Verstegen (Ms. Verstegen), State Bar
investigator was on stand as a State Bar witness, DTC introduced an envelope
which did not have any stamps and it contained a five page letter with
attachments.  DTC asked Ms. Verstegen about that envelope and she replied that
one day she found this unopened envelope that did not have any stamps or any
names lying on her desk.  She stated that she thought that probably it had come in
overseas mail but the State Bar had to log any irregular mail.  However, she
checked but could not find out how the letter got into her office and on to her desk.
(T.T. III-20:1-10). State Bar Exhibit 27.[6]

Petitioner was shocked to learn about this new development.  This
unstamped envelope containing the letter was in fact mailed in a Red and Yellow
DHL Cover Envelope with proper address and an Airway Bill.  Next day after the
trial, Petitioner called AFL in India and was advised that AFL had indeed sent that
envelope enclosed in a DHL Cover Envelope with proper address.  Petitioner
could not rebut this development during the trial.  After the trial Petitioner
received the copy of a return, acknowledged and received, Airway Bill from India
and sent that to the judge as his Exhibit FFF.  Petitioner also attached his Exhibit

---

[6] It is customary, not only in international mails but in domestic Priority or Fedex
mails to just enclose an envelope WITHOUT stamps in the cover container.

FFF to his Closing Arguments. The judge, however, refused to admit it because it was "too late." (Dec. p.20 Footnote 30)

This envelope in fact contained a five-page detailed account of Jagjit's investment and dealings with AFL. The judge remarked that "In sum, the letter conveniently supported Respondent's arguments without any credible evidence." (Dec. p.11:9-10) The judge ignored contents of the letter that clearly detailed the dealings of Jagjit and his brother-in-law, who was desperately trying to use AFL to obtain his visa to the U.S. The judge focused on AFL's promise to issue stocks, which, she emphasized, AFL did not follow up on. (Dec. p.11:1-10). (Her statement is confusing. Here the judge duly acknowledges the existence of AFL, and later she terms AFL as a sham and non-existent company. (Dec. p. 11:14))

Petitioner strongly believes that this DHL Cover Envelope was intentionally suppressed. The reason for such an act is absolutely clear and apparent. DTC simply did not want to show that the letter was in fact received from India. Their strategy was to blame the delivery of this letter somehow on Petitioner. And the strategy in fact did succeed. The judge in her decision wrote, "Absent any tampering, the Court believes that Respondent somehow had the letter delivered to the State Bar and not necessarily from India." (Dec. p. 11:1-2) It is sad to note that the judge would resort to such a tactic in order to punish Petitioner. By that statement, the judge is accusing Petitioner of a crime of tampering with the evidence by speculation. The judge is implying that petitioner somehow bypassed the security and log-ins, found the office of Ms. Verstegen, and, after placing the envelope, sneaked out of the State Bar offices without being seen or detected.

### 2. The Third Deposit Slip of Personal Account:

Jagjit Randhawa called Petitioner on November 18, 1996, and informed him that he had deposited $9,000 in his personal account, number, 05557-071176

for the partial payment of fees and $9,000 into the account of Khanna Foods,
account number 05559-071175 at the Mira Vista branch of Bank of America in El
Cerrito. See <u>State Bar Exhibit 28, Page Two</u>. Jagjit further informed Petitioner
that the $9,000 was for investment into AFL. Next day, despite Petitioner's
objection and reprimand, Jagjit deposited another $7,000 for investment into AFL
by depositing it in the account of Khanna Foods. Two deposits into Khanna Foods
were made by using two deposit slips, instead of one, because they were made a
day apart and one deposit slip was made to deposit in Petitioner's personal
account. In all, three deposits were made with three deposit slips.

The personal account deposit slip which showed 'partial payment for legal
fees' has been SUPPRESSED. There is no question, whatsoever, that ***three*** deposit
slips existed. Mr. Byrnes confirmed this in his letter to the State Bar in which he
stated that **three** deposit slips were enclosed. (<u>Exhibit 16, page 2, para 2</u>) Jagjit
and Baljit confirmed under the penalty of perjury that they had enclosed **three**
deposit slips with their complaint. (<u>Exhibit 9, page 5, para 2, line 4</u>). Baljit
testified that Mr. Khanna gave three deposit slips to her husband. (T.T.II-79-12-
14). Ms. Verstegen confirmed that she received records from Bank of America of
**two** accounts. (<u>T.T. III-15:8</u>)

Petitioner alleges that this third deposit slip, which was exculpatory
evidence and proved that it was not $25,000 as DTC alleged but $16,000 that was
deposited by Randhawas for investment, and that the $9,000 deposited in the
personal account was for the legal fees. This deposit slip would have impeached
Jagjit's testimony at trial where he changed his story and said that the deposit
made into Petitioner's personal account was also for AFL. Non suppression of
this deposit slip would have certainly exonerated Petitioner. The suppression of
this material piece of evidence was extremely prejudicial and harmful to
Petitioner.

32

Suppression by the prosecution of favorable and exculpatory evidence (DHL Cover Envelope and the Deposit Slip) is a ground for reversal of judgment. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court of the United States stated that, " suppression by the prosecution of evidence favorable to an accused who has requested it violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Pp. 86-88.

Even if this request for disclosure of exculpatory evidence is refuted by DTC because it was oral, the Supreme Court in *United States v. Agurs*, 427 U.S. 97 (1976), has held that it is the prosecutor's duty to disclose to the defense exculpatory evidence in her possession, even in the absence of a request, or upon a general request if it passes a tripartite test of materiality of the exculpatory evidence in the context of the trial record.

In a recent Supreme Court decision, *Banks v. Dretke* (2004) 000 U.S. 02-1603, Justice Ginsburg applied *Brady* and held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." (Citations omitted).

All three essential elements of *Brady (Brady v. Maryland* (1963) 373 U.S. 83)*, and the tripartite test of *Agurs* are satisfied here – the deposit slip was favorable to Petitioner as exculpatory and worthy of impeaching Jagjit; the deposit slip was in fact suppressed and third it was prejudicial.

**B. WITNESS TAMPERING:**

The first correspondence, about this case started between Randhawas' attorney Bryant Byrnes and Petitioner in July 2001. Byrnes alleged that Randhawas deposited $25,000 in Respondent's various accounts for investment in AFL in 1996. A regular traffic of letters between Byrnes and Petitioner continued

till September 2001 when it abruptly stopped. On or about November 20, 2001, Randhawas filed a complaint under the penalty of perjury with the State Bar. (Exhibit 9) An investigation ensued between the State Bar's investigation unit, Byrnes and Respondent. The State Bar investigation unit took over about one and one half years in its investigation.

On June 25, 2003, the State Bar's Office of the Chief Trial Counsel filed a Notice of Disciplinary Charge which mentioned only $25,000. Then during deposition, both Jagjit and Baljit in reference to the letter from AFL, Exhibit 28-6, stated that they gave an additional $6000 to Petitioner to make a total of Indian Rupees ten Lakhs (10,00,000 – a Lakh is a unit of 100,000). However, this new investment of $6,000 turned into $5,000 during the trial of Jagjit and he testified under oath the second time that Indian Rupees ten Lakhs equaled $30,000 and not $31,000.

The important question here is how did this new figure suddenly come up during depositions and trial. Petitioner hereby presents the inconsistent testimony given by Jagjit and Baljit for this Court to evaluate with regard to whether any of it is credible. believes that during witness preparation this letter mentioning ten Lakhs, Exhibit 28-6, was probably discussed between DTC and the witnesses. The witnesses and DTC, particularly DTC, became confused about the prevalent rate of exchange between the Indian Rupee and the U,S, Dollar during the direct examination of Jagjit and made a mistake when she inadvertently referred to the extra amount given to Petitioner as $5000 instead of $6000. Until then, neither Jagjit and Baljit had ever wavered during deposition from the amount of $6000. Now, Jagjit took DTC's lead and corroborated under oath that the sum was $5000 and not $6000. During the direct examination of Baljit, Baljit also made a mistake. She apparently forgot whether she was supposed to mention $5000 or $6000, so she compromised and said it was between $5000 and $6000. At one

point in their testimony, they both state they were together when they gave the extra money to Petitioner. (T.T.)  At the partial retrial, under cross-examination, Jagjit stated that the amount was EXACTLY $6000. (T.T.)    It is apparent that neither Jagjit and Baljit would have come up with this $5000 or $6000 figure had they not been coached by DTC.

It is apparent that DTC was well aware of this fact.  She knew it to be false. She knew both her witnesses were committing and had committed perjury.  She not only helped but rather encouraged them to do so.  They all decided that they had to justify the investment of Indian Rupees Ten Lakhs as stated by AFL in their letter (Exhibit 28, page six).  However, all three, DTC, Jagjit and Baljit got discombobulated and It is clear from the evidence and the ever changing testimony of the witnesses that they could not remember how to come up with a figure which the Court would accept. (They did not have to worry about that. The judge did not care whether it was $5,000 (Judge's statement, T.T.  or $5,000 to $6,000, T.T. or $6,000, T.T.) DTC was well aware of this perjury being committed by her witnesses.  There is no other explanation.  It is extremely improbable that any other reason could exist.  It is highly unlikely that both Jagjit and Baljit would forget the exact amount they gave in cash to Petitioner whether it was nine years ago or not. (Here is an example that shows that a trial by jury would have certainly helped an honest result to ensue)  Strangely enough, Jagjit under cross-examination states that it was a mistake when he mentioned that the amount of five thousand and not six thousand.

In a United States Court of Appeals, Ninth Circuit, case, *Commonwealth of the Northern Mariana Islands v. Bowie* (2001) 236 F. 3d 1083, the Court stated,

> "The ultimate mission of the system upon which we rely to protect
> the liberty of the accused as well as the welfare of society is to
> ascertain he factual truth, and to do so in a manner that comports

35

with due process of law as defined by our Constitution. This important mission is utterly derailed by unchecked lying witnesses, and by any law enforcement officer or prosecutor who finds it tactically advantageous to turn a blind eye to the manifest potential for malevolent disinformation. See United States v. Wallach, 935 F.2d 445 (2nd Cir. 1991) ("Indeed, if it is established that the government knowingly permitted the introduction of false testimony `reversal is virtually automat-ic.' ") (citations omitted); Cf. Franks v. Delaware, 438 U.S.154 (1978) ("[I]t would be an unthinkable imposition upon [the authority of a magistrate judge] if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.").

Because of the gravity of depriving a person of liberty on the basis of false testimony, the Supreme Court and the United States Courts of Appeal have fashioned over the years a workable set of precise rules designed not only to remedy egregious wrongs that have already occurred, but also prophylactically to prevent damaging false testimony from happening in the first place.1 In Mooney v. Holohan, 294 U.S. 103, 04 (1935), for example, petitioner Mooney alleged that "the ole basis of his conviction was perjured testimony, which as knowingly used by prosecuting authorities in order to obtain that conviction ".Id at 1089-90. . ."

## C. SUPPRESSION OF EXCULPATORY PHONE CONVERSATION OF DTC WITH SUPERIOR COURT JUDGE HONORABLE JULIE CONGER:

Petitioner respectfully requests this Court to please rule whether DTC should be sanctioned for withholding the conversation she had with Judge Conger

over the phone during a break in the trial, a mitigating factor. The way the entire trial was being conducted, Petitioner is not sure whether this information would have made any difference or not, but both morally and ethically it is required that DTC should have revealed this conversation to the judge. DTC had a very lengthy telephone conversation with Judge Conger of the Alameda County Superior Court. DTC vividly explained the charges to Judge Conger. The conversation was held privately and Petitioner was precluded from participating. It is believed that Judge Conger gave an excellent character reference both as a long-time family friend and as a lawyer.

## VIII. RIGHT TO COUNSEL:

There is a considerable confusion whether an accused attorney has the right to a counsel in the proceedings before the hearing department or not. The Review Department cases suggest that an attorney does NOT have any constitutional rights to counsel or effective assistance from counsel in disciplinary hearing. *In the Matter of Acuna*, (Review Dept. 1996) 3 Cal. State Bar Ct. Rptr. 495.

Then what does section 6085 subdivision (b) refers to? . What does the reasonable right to counsel actually mean?

More confusion arises about the Supreme Court's holding in *Ainsworth*, 46 Cal. 3d 1218. There the Court stated that, "Moreover, State Bar proceedings are generally regarded as quasi-criminal in nature, and a State Bar member is not entitled to traditional criminal procedure safeguards. (Citations). Finally, we have recognized that although a State Bar member is entitled to a "reasonable"

37

opportunity and right to be represented by counsel under section 6085, it is the attorney's responsibility to obtain representation. (Citations), Id at 1230.

A ruling is requested about this opportunity and right to be represented by counsel in this particular case.

Here, Petitioner had two attorneys represent him. As this case dragged on and on with unnecessary discovery motions and orders for over two and one half years, Petitioner could not afford the services any more. Nevertheless, as the trial progressed and a serious physical emergency arose during the hearings, Petitioner made an urgent appeal to the hearing judge for the need of a lawyer. This appeal did NOT ask for the State Bar Court to appoint counsel. Petitioner was himself going to PAY for the services even if he had to sell his house or personal belongings. Yet this request was denied.

> MR. KHANNA:    Your Honor, can I ask for a continuance because I do not    have (testimony missing) I feel here very strongly that I do not have the ability here to really question and I'm taking the time of this Court and I (testimony    missing)
>
> THE COURT:    No, I think I'll – I'll give you five minutes to compose yourself and think of the questions.
>
> MR. KHANNA:    I need to get a lawyer. I just need to get a lawyer.
>
> THE COURT:    At this point. It's (testimony missing)
>
> MR. KHANNA:    This is very crucial (testimony missing) a very crucial matter. False statements have been filed with the State Bar, and I need somebody t    o kind of help me, and I'm asking that I need to get (testimony missing)

THE COURT:        I am not going to give you a continuance.

MR. KHANNA:    Okay, all right your Honor.

THE COURT:    You had two lawyers in this case.  They represented you ably, and for some reason, they're no longer representing you, and we need to proceed.

MR. KHANNA:    Yes (testimony missing)

T.T. II-54: 5-24

Petitioner feels that the way and in the tone the hearing department judge denied this request was very inhumane and also cruel in nature given the circumstances.  Right during the stressful questioning of the main witness, Baljit, Petitioner suffered an attack of Tachycardia where his heartbeat shot up to 200 to 250; he became disoriented, dizzy and almost collapsed. Petitioner immediately took his medicine and requested the need for a counsel. He asked just for ONE-day continuance. This is what happened at the hearing:

MR. KHANNA:  I am tired, your Honor.  I just can't do (testimony missing) its 4:30 and I'm (testimony missing)

THE COURT:  No, I understand that, but you need to - - (testimony missing) if you're going to ask her questions - - (testimony missing)

MR. KHANNA:  I am very sick and I'm not feeling well, your Honor, and I can get you a doctor's certificate, if that's needed.

THE COURT:  I understand that, but the witness is here and she - (testimony missing)

MR. KHANNA:  I just am not in a position, your Honor. I'm sick.

THE COURT:  Do you have questions to ask her?

MR. KHANNA:  Yes, a lot.  A lot of questions to ask her.

THE COURT:  Well, you need to ask her at least questions till 5:00

MR. KHANNA: I can't do it right now in half an hour.

*THE COURT: No one is saying that you have to complete it in half an hour, but what we are saying is that you have to begin to ask her questions.*

MR. KHANNA:  Your Honor, I'm requesting very humbly that I'm tired.  I am not well.

THE COURT:  I understand that.  I'm asking – – (testimony missing)

MR. KHANNA:  I have a heart condition and I don't think I can carry on.  I need  – – (testimony missing) I need help to do it tomorrow morning.

THE COURT:  Well, what we – what do you mean?

MR. KHANNA; I have to cross-examine her tomorrow.

*THE COURT:  Right, and what I'm suggesting is that you cross-examine   her until 5:00. Ask her questions until 5:00, and then we will take a break.*

MR. KHANNA; I want to – –  (testimony missing)

Your Honor.  I'm just not well and I'm being forced to do that.  This is just – – (testimony missing) anyway, I'll do whatever you say.

THE COURT: Okay, let's proceed. At least, get some questions out, because she cannot keep coming back as a witness.

T.T. II-95: 3-25,96:1-15

Petitioner submits his treating physician, Dr. John Edlin's, one of the Bay Areas' top Cardiovascular surgeon, letter testifying that the situation which occurred during the trial is very likely to happen given the medical condition of Petitioner. The letter is attached as Exhibit GGG.

Furthermore, a sincere argument can be made that petitioner provided for himself very incompetent and ineffective services that clearly jeopardized his case. He is NOT a litigator or experienced in trial practice at all. He is an international project finance lawyer who occasionally undertakes small legal work particularly from poor immigrants from India who need very specialized and caring legal services at reduced rates and someone who can understand their culture and language.

The entire record is full of this incompetence. One look at the trial transcript would show how the judge has bamboozled and controlled petitioner and has taken devastating advantage of Petitioner. A recent case just decided by this Court, People v. Sturm, simply pales before this case. The judge there never interfered with the evidence. The trial judge in Strum did not alter or invent facts. The trial judge in Strum did not accuse defense counsel Kelly with committing a CRIMINAL act of tempering with evidence and supplanting evidence. The trial judge interrupted only five time during the prosecutor's presentation in Strum

whereas during the defense counsels presentation only 0 times. Here the judge interrupted DTC only ONCE and petitioner over 117 times. The trial judge did not laugh or sneer at the defense counsel. He just made very damaging and insulting remarks. Here, the judge clearly surpassed that behavior. She literally controlled the entire proceedings. The record is full of her control. Sneering and smiling on inadequate and inexperienced way of questioning is far more humiliating than admonishing the defense counsel about not listening to the judge. There in the *Strum* case, the trial judge had to worry about the effect his utterances would create on the jury. Here she is her boss. She is the judge and the jury. If she is requested by Petitioner to please recuse herself, she denies the motion. Apart from these prejudicial acts of the hearing judge, she even fabricated evidence, which simply cannot be denied. For example, the judge ruled that Petitioner represented Baljit in her TRO matter. Cite. There is no documentary evidence to support her finding. Even Baljit stated in the open court that petitioner did not represent her. Her husband said that petitioner did not represent her. Her attorney said that petitioner did not represent her. Even DTC said Petitioner did not represent her. Court document with Baljit's sworn affidavits confirmed that she was represented by a different lawyer. Then why would a learned judge resort to such fact-finding? The answer escapes Petitioner and Petitioner does not want to speculate. (Here is a good example as to why the State Bar proceedings should be conducted before a jury.) This treatment, snickering, sneering and smiling on the goofs Petitioner made, was very condescending and shameful for Petitioner.

42

Petitioner's right to counsel guaranteed under the sixth amendment applicable to defendants in criminal cases should also apply to the State Bar Court quasi-criminal cases.

## IX. ADEQUACY OF NOTICE

The NDC filed by the State Bar does not in any count or manner allege Petitioner received extra $6,000 on or about November 1996 or December 1996 or January 1997 from Randhawas. Eight years later during their deposition, they made a new charge that they gave another $6,000 to Petitioner for investment purposes that their attorney failed to lodge in the complaint. Jagjit stated that he told his attorney His attorney, Mr. Byrnes stated that he found out only during the deposition. Who is telling the truth is not known.

DTC should have amended the NDC and filed new charges because DTC was present at the deposition. However, no amendment was filed. During trial this new charge was brought. Petitioner contends that this new charge denied him due process to prepare and defend himself.

Petitioner relies on the Supreme Court holdings in the following cases where the issue of Adequacy of Notice was discussed.

1. *Emslie v. State Bar* (1974) 11 Cal.3d 210 "[t]he right to practice one's profession is sufficiently precious to be surrounded by a panoply of legal protection." (*Id.* at p. 226.) This includes invocation of civil and criminal procedural rules when necessary to insure administrative due process. (*Id.* citing *Werner v. State Bar* (1944) 24 Cal.2d 611, 615.)

2. *People v. Thomas* (1987) 43 Cal.3d 818: "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by

43

surprise by evidence offered at his trial. No principle of procedural due process is more clearly established than that the notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." (*Id.* at p. 823, citing *Cole v. Arkansas* (1948) 333 U.S. 196, 201.)

3.      *Woodard v. State Bar* (1940) 16 Cal.2d 755: "The right to practice law is a valuable one which should be suspended or revoked only on charges alleged and proved and as to which full notice and opportunity to defend have been accorded"].)

4.      Thus, even when no objection has been raised by the respondent, the Supreme Court has in recent years criticized the failure of the charges in the notice to show cause to relate individual facts to specific statutory and rule violations. (*Baker v. State Bar* (1989) 49 Cal.3d 804, 816; *Guzzetta v. State Bar* (1987) 43 Cal.3d 962, 968; *Maltaman v. State Bar* (1987) 43 Cal.3d 924, 931.)

5.      In *Guzzetta* our Supreme Court was critical of State Bar actions where the link between the alleged misconduct and specific charges is not evident from the record, finding that "[n]either the charges, nor the ultimate findings and conclusions in the instant record relates the conduct charged as violations of petitioner's duties as an attorney to the statutes or Rules of Professional Conduct that the State Bar concludes have been violated." (*Guzzetta v. State Bar, supra,* 43 cal.3d at p. 968.) the court went on to note, "Not only does this failure make the work of this court more difficult since we are forced to determine the basis for the recommended discipline by deductive reasoning, but it also brings into question the adequacy of the notice given to an attorney of the basis for the disciplinary charges. (See *Gendron v. State Bar* (1983) 35 Cal.3d 409, 420; *Woodard v. State Bar* (1940) 16 Cal.2d 755, 757.)" (*Guzzetta v. State Bar, supra,* at p. 968, fn. 1.) The same concerns were raised in *Maltaman,* and the same

44

language from *Guzzetta* was quoted by the court to emphasize its point.
(*Maltaman v. State Bar, supra,* 43 Cal.3d 924, 931, fn. 1.)

   6.    *Baker v. State Bar* (1989) 49 Cal.3d 804: The Supreme Court again
addressed the issue of adequacy of notice: "Once again we are constrained to call
to the attention of the State Bar Court the importance of identifying with
specificity both the rule or statutory provision that underlies each charge and the
manner in which the conduct allegedly violated that rule or statutory provision.
While petitioner here does not complain of any due process violation in lack of
notice, this specificity is also essential to meaningful review of the
recommendation of the State Bar Court." 49 Cal.3d at 816

## X. PERJURY:

The issue before this Court is whether the Randhawas can be convicted of perjury

committed during both the trial and the deposition in the State Bar Court

proceedings, which are conducted before a Non-Article VI, section 1

judgeCredibility of Petitioner is the fundamental issue of this entire case.  Both

Baljit and Jagjit Randhawa have attacked petitioner's credibility.  In order to

discredit Petitioner, both Baljit and Jagjit have resorted to lies and false

statements where they have clearly committed the acts of perjury.  Petitioner

asserts, based on the testimonies given by both Baljit and Jagjit under the penalty

of perjury and under the laws of the State of California that both DTC and the

judge were FULLY aware of the perjured statements and no action was taken

despite various requests made to the judge.  Petitioner, herein, respectfully

submits the willful, intentional and deliberate acts of perjury committed by Baljit

45

and Jagjit for evaluation by the Court to decide whether perjury committed in non-judicial, quasi-criminal, administrative settings, particularly during depositions can be considered a felony under the Penal Code section 118[7] in California.

## A. Testimony of Baljit:

Q. Did you get a citation on February 22nd, 1996 from a police officer?

A. Yes.

Q. Do you remember what was that case about?

A. *I was driving the car* (Emphasis added). I had no license, but I had a license from India, so I don't speak much English on that time, so I couldn't explain to the officer that I had a license from India. I don't have a license from here.

Q. So this is your testimony that you were driving the car at that time this accident happened.

A. Yes.

(T.T. III-60: 24-25, 61:1-9)

In her affidavit submitted under oath and under the penalty of perjury for theTemporary Restraining Order (TRO) in her Order to Show Cause in the Contra

---

[7] 118. (a) Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury.